## William A. Russell *v.* Dean Witter Reynolds, Inc., et al.
### (12557)

Peters, C. J., Healey, Dannehy, Santaniello and Callahan, Js.

 

Argued April 1—decision released June 10, 1986

*Sharon S. Tisher,* with whom was *Kim M. Cooke,* for the appellants (defendants).

*David R. Schaefer,* with whom were *Mary-Michelle U. Hirschoff* and, on the brief, *Robert J. Lofgren* and *Marc R. Cohen,* for the appellee (plaintiff).

*Joseph I. Lieberman,* attorney general, and *Robert M. Langer* and *Neil G. Fishman,* assistant attorneys general, filed a brief as amici curiae.

PETERS, C. J. The principal issue on appeal in this case is whether the Connecticut Unfair Trade Practices Act applies to the purchase and sale of securities. The plaintiff, William A. Russell, brought suit against the defendants, James J. Reid and Dean Witter Reynolds, Inc. (Dean Witter), to recover for losses he sustained as a result of a securities transaction that the defendants had arranged. The plaintiff alleged that the defendants had broken their contract with the plaintiff, made fraudulent misrepresentations, handled the plaintiff's account negligently, and violated both the Connecticut Uniform Securities Act (CUSA); General Statutes §§ 36-470 through 36-502; and the Connecticut Unfair Trade Practices Act (CUTPA). General Statutes §§ 42-110a through 42-110q. A jury found for the plain-

tiff on all but the fraud count and the court held the defendants liable to the plaintiff for $18,120.09 in compensatory damages, $42,294.75 in attorney's fees, and $34,240.18 in punitive damages. The defendants appeal from this judgment.

The jury could reasonably have found the following facts. On April 8, 1981, the plaintiff authorized his stockbroker Reid, an employee of Dean Witter, to purchase for his cash account 1000 shares of stock in Basic Earth Science Systems, Inc. (BESS). Reid proceeded to buy 2000, rather than 1000, shares of BESS stock in a margin account on the plaintiff's behalf. When the plaintiff learned of the size of the transaction, he immediately called Reid and objected. Reid told him that Dean Witter had made a clerical error in recording the transaction and that he would take care of the problem. Several days later, after receiving written confirmation from Dean Witter of a purchase of 2000 shares, the plaintiff again complained to Reid. Reid reassured the plaintiff that a "computer foul up" had caused the discrepancy and that he had purchased only the authorized number of shares. In early May, 1981, Dean Witter sent the plaintiff a statement of his account that indicated that he had purchased 2000 shares of stock in BESS and that he owed Dean Witter interest on the money Dean Witter had used to buy the stock. When the plaintiff confronted Reid with this document, Reid acknowledged that he had indeed purchased 2000 shares for the plaintiff and advised the plaintiff to keep the shares because they would be profitable. The plaintiff called Reid several more times during the next few days to complain further about the transaction. Finally, on May 14, 1981, the plaintiff directed Reid to sell enough of the BESS stock by May 29 to pay for the unauthorized shares. Reid agreed to follow this instruction, but did not carry it out. In early June of 1981, the price of BESS stock dropped sharply. The plaintiff was

forced to sell at a substantial loss over half of the shares in BESS that Reid had purchased for him in the disputed transaction.

On appeal, the defendants claim that the trial court erred in: (1) holding that CUTPA applies to the purchase and sale of securities; (2) instructing the jury improperly on several points of law; (3) admitting the testimony of other investors who had dealt with Reid; and (4) awarding the plaintiff full attorney's fees. We find error in part.

I

The defendants initially claim that the trial court erred in holding them liable to the plaintiff under CUTPA because CUTPA does not apply to the purchase and sale of securities. We agree.

The Connecticut statute that expressly governs the purchase and sale of securities is CUSA, which in General Statutes § 36-498[1] provides a private remedy for

---

[1] "[General Statutes] Sec. 36-498. BUYER'S REMEDIES. (a) Any person who: (1) Offers or sells a security in violation of subsection (a) of section 36-474, 36-485 or subsection (b) of section 36-493 or of any regulation or order under section 36-491 which requires the affirmative approval of sales literature before it is used, or of any condition imposed under subsection (d) of section 36-487 or subsection (g) or (h) of section 36-488; or (2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security.

"(b) Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer, or director of such a seller, every person occupying a similar status or performing similar func-

a buyer who has suffered injury because of allegedly deceptive sales practices by someone who offers or sells a security. That statute affords the defrauded buyer the right to recover restitutionary damages, interest and attorney's fees. We have not previously had occasion to consider whether an aggrieved buyer of securities may also invoke the provisions of CUTPA to afford him additional remedies, principally in the form of punitive damages. General Statutes § 42-110g.[2]

tions, every employee of such a seller who materially aids in the sale and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution as in cases of contract among the several persons so liable.

"(c) Any tender specified in this section may be made at any time before entry of judgment.

"(d) Every cause of action under this chapter survives the death of any person who might have been a plaintiff or defendant.

"(e) No person may sue under this section more than two years after the contract of sale. No person may bring an action under this section: (1) If the buyer received a written offer, before suit and at a time when he owned the security, to refund the consideration paid together with interest at six per cent per year from the date of payment, less the amount of any income received on the security, and he failed to accept the offer within thirty days of its receipt, or (2) if the buyer received such an offer before bringing a cause of action and at a time when he did not own the security, unless he rejected the offer in writing within thirty days of its receipt.

"(f) No person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any regulation or order hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any cause of action on the contract.

"(g) Any condition, stipulation or provision binding any person acquiring any security to waive compliance with any provision of this chapter or any regulation or order hereunder is void.

"(h) The rights and remedies provided by this chapter are in addition to any other rights or remedies that may exist at law or in equity."

[2] "[General Statutes (Rev. to 1981)] Sec. 42-110g. ACTION FOR DAMAGES. CLASS ACTIONS. COSTS AND FEES. EQUITABLE RELIEF. (a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the

The trial court concluded that the plaintiff had stated a cause of action under CUTPA because of the broad sweep of CUTPA's coverage of unfair or deceptive acts or practices "in the conduct of any trade or commerce." General Statutes § 42-110b (a).[3] The court noted that none of CUTPA's express exemptions referred to security transactions; see General Statutes § 42-110c;[4]

plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper.

"(b) Persons entitled to bring an action under subsection (a) of this section may, pursuant to section 42-110h bring a class action on behalf of themselves and other persons similarly situated who are residents of this state or injured in this state to recover damages.

"(c) Upon commencement of any action brought under subsection (a) of this section, the plaintiff shall mail a copy of the complaint to the attorney general and, upon entry of any judgment or decree in the action, shall mail a copy of such judgment or decree to the attorney general.

"(d) In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery. In a class action in which there is no monetary recovery, but other relief is granted on behalf of a class, the court may award, to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorneys' fees. In any action brought under this section, the court may, in its discretion, order, in addition to damages or in lieu of damages, injunctive or other equitable relief.

"(e) Any final order issued by the department of consumer protection and any permanent injunction, final judgment or final order of the court made under section 42-110d, 42-110m, 42-110o or 42-110p shall be prima facie evidence in an action brought under this section that the respondent or defendant used or employed a method, act or practice prohibited by section 42-110b, provided this section shall not apply to consent orders or judgments entered before any testimony has been taken.

"(f) An action under this section may not be brought more than three years after the occurrence of a violation of this chapter."

[3] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition under unfair or deceptive acts or practices in the conduct of any trade or commerce."

[4] "[General Statutes] Sec. 42-110c. EXCEPTIONS. (a) Nothing in this chapter shall apply to: (1) Transactions or actions otherwise permitted under law as administered by any regulatory board or officer acting under statutory authority of the state or of the United States; or (2) acts done by the

and observed that CUTPA, as a remedial statute, should be generously construed to protect the victims of unfair or deceptive trade practices. General Statutes § 42-110b (d);[5] *Hinchliffe* v. *American Motors Corporation*, 184 Conn. 607, 615, 440 A.2d 810 (1981). In further support of the trial court's position, the plaintiff reminds us that CUSA itself does not purport to preempt "other rights [and remedies] that may exist at law or in equity." General Statutes § 36-498. Although these contentions are certainly plausible, and the question of statutory construction is a close one, we have reached the opposite conclusion.

The crucial question is not whether CUSA transactions are exempt from CUTPA but whether CUTPA itself can fairly be interpreted to encompass such transactions in the first instance. We recognize the sweeping nature of the reference in § 42-110b (a) to "deceptive acts or practices in the conduct of *any* trade or commerce" (emphasis added) and the breadth of the definition of "trade" and "commerce" in § 42-110a (4).[6] This statutory language must, however, be reconciled with the equally unconditional statutory language that, in construing § 42-110b (a), "the commissioner and the courts of this state shall be guided by interpretations

publisher, owner, agent or employee of a newspaper, periodical or radio or television station in the publication or dissemination of an advertisement, where the publisher, owner, agent or employee did not have knowledge of the false, misleading, unfair or deceptive character of the advertisement, and did not have direct financial interest in the sale or distribution of the advertised product or service.

"(b) The burden of proving exemption, as provided in this section, from the provisions of this chapter shall be upon the person claiming the exemption."

[5] General Statutes § 42-110b (d) provides: "It is the intention of the legislature that this chapter be remedial and be so construed."

[6] General Statutes § 42-110a (4) provides: " 'Trade' and 'commerce' means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."

given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. 45 (a) (1)), as from time to time amended." General Statutes § 42-110b (b).

This court has repeatedly held, in accordance with this statutory instruction, that Federal Trade Commission (FTC) rulings and cases under the Federal Trade Commission Act (FTC Act) serve as a lodestar for interpretation of the open-ended language of CUTPA. *McLaughlin Ford, Inc.* v. *Ford Motor Co.,* 192 Conn. 558, 567–68, 473 A.2d 1185 (1984); *Conaway* v. *Prestia,* 191 Conn. 484, 492–93, 464 A.2d 847 (1983); *Ivey, Barnum & O'Mara* v. *Indian Harbor Properties, Inc.,* 190 Conn. 528, 533–34, 461 A.2d 1369 (1983); *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo,* 190 Conn. 510, 517–18, 461 A.2d 938 (1983); *Hinchliffe* v. *American Motors Corporation,* supra. In *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo,* supra, 518–19, in determining the applicability of CUTPA to the provision of legal services, we undertook a searching inquiry of the federal cases and of the statements of the FTC before concluding that CUTPA applied to attorneys. In *Ivey, Barnum & O'Mara* v. *Indian Harbor Properties, Inc.,* supra, 534–36, 539–40, we looked to the standards developed by the FTC for our determination of what constitutes a cognizable unfair or deceptive practice under CUTPA.

Our recent decision in *Mead* v. *Burns,* 199 Conn. 651, 509 A.2d 11 (1986), does not signal a departure from this interpretative principle. We there concluded that CUTPA covered deceptive practices in the insurance industry although the FTC does not presently regulate such conduct. In reaching that conclusion, we relied upon federal legislation, the McCarran-Ferguson Act, 15 U.S.C. § 1012 (b), which recognizes that federal regulation of insurance by the FTC would be appropriate "to the extent that such business is not regu-

lated by State Law." See also *United States* v. *South-Eastern Underwriters Assn.*, 322 U.S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440 (1944). Since federal law has thus authoritatively informed us that insurance is presumptively within the ambit of the FTC, we were led to a similar conclusion about the coverage of CUTPA.

Application of the FTC lodestar to this case leads us to conclude that CUTPA does not apply to deceptive practices in the purchase and sale of securities. The FTC has never undertaken to adjudicate deceptive conduct in the sale and purchase of securities, presumably because such transactions fall under the comprehensive regulatory umbrella of the Securities and Exchange Commission. See Securities Act of 1933, 15 U.S.C. § 77a et seq.; Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. Despite the breadth of the language of § 5 (a) (1)[7] of the FTC Act, which, read literally, would include security transactions, the plaintiff has cited no case in which the FTC or a federal court has applied the FTC Act to a securities transaction and we have found none. Indeed, in an agency statement listing the types of transactions and conduct to which the FTC Act applies, the FTC makes no mention of securities. 3 Trade Reg. Rptr. (CCH) ¶ 9551, pp. 17,021–22. Consequently, in this case, taking our guidance from the FTC, we must construe CUTPA as not purporting to cover transactions for the purchase and sale of securities.

This conclusion finds support in the totality of the legislative and administrative patterns regulating deceptive practices in this state. In contradistinction to the statutes governing unfair insurance practices;

---

[7] "[15 U.S.C.] § 45. UNFAIR METHODS OF COMPETITION UNLAWFUL; PREVENTION BY COMMISSION. (a) DECLARATION OF UNLAWFULNESS; POWER TO PROHIBIT UNFAIR PRACTICES . . . (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

see *Mead* v. *Burns,* supra, 656–57; CUSA unequivocally provides a private cause of action for injuries caused by deceptive purchases and sales of securities. General Statutes § 36-498. Although this uniform statute was not enacted in Connecticut until 1977, four years after the passage of CUTPA in 1973, its predecessors in Connecticut law had established the existence of a private cause of action in Connecticut; General Statutes (Sup. 1969) §§ 36-338[8] and 36-346;[9] well before the enactment

[8] "[General Statutes (Sup. 1969)] Sec. 36-338. PROHIBITED ACTS. (a) No person, in connection with the sale, offer to sell, purchase or offer to purchase of any security, directly or indirectly, shall (1) employ any device, scheme or artifice to defraud, (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or (3) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

"(b) No person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise, shall (1) employ any device, scheme or artifice to defraud the other person or (2) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon the other person.

"(c) Any person who violates any provision of this section shall be fined not more than ten thousand dollars or imprisoned not more than ten years or both."

[9] "[General Statutes (Sup. 1969)] Sec. 36-346. CIVIL LIABILITY FOR SALES IN VIOLATION OF LAW. (a) Any person who offers or sells a security in violation of section 36-322 or 36-338 is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per annum from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages shall be the amount that would be recoverable upon a tender, less the value of the security when the buyer disposed of it, and interest at six per cent per annum from the date of disposition.

"(b) Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale and every broker or dealer or salesman who materially aids in the sale shall be liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he

of CUTPA. Consistently, the commissioner of consumer protection, who bears administrative responsibility for the enforcement of CUTPA, has never sought to enforce CUTPA in the context of a security transaction. The commissioner has promulgated no regulation pertaining to the deceptive sale of securities; Regs., Conn. State Agencies §§ 42-110b-1 through 42-110b-28; and, to the best of our knowledge, has obtained not one order or injunction relating thereto.[10] This history demonstrates that, following the lead of the FTC, Connecticut has long separated regulation of the purchase and

did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution as in cases of contract among the several persons so liable.

"(c) Any tender specified in this section may be made at any time before entry of judgment.

"(d) Every cause of action under this chapter survives the death of any person who might have been a plaintiff or defendant.

"(e) No person may sue under this section more than two years after the contract of sale. No person may sue under this section (1) if the buyer received a written offer, before suit and at a time when he owned the security, to refund the consideration paid, together with interest at six per cent per annum from the date of payment, less the amount of any income received on the security, and he failed to accept the offer within thirty days of its receipt, or (2) if the buyer received such an offer before suit and at a time when he did not own the security, unless he rejected the offer in writing within thirty days of its receipt.

"(f) No person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any regulation hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract.

"(g) Any condition, stipulation or provision binding any person acquiring any security to waive compliance with any provision of this chapter is void.

"(h) The rights and remedies provided by this section are in addition to any rights and remedies that may exist at law or in equity, but this chapter shall not create any cause of action not specified in this section."

[10] The defendants, in their brief, contend that no record exists of any attempt by the commmissioner of consumer protection to apply CUTPA to the securities industry. In failing to respond to this claim, the plaintiff apparently acknowledges the absence of any such precedent.

sale of securities from the regulation of unfair trade practices in other industries.

Furthermore, our conclusion is reenforced by the holdings of courts in other jurisdictions. A similar decision by the Massachusetts Supreme Judicial Court in *Cabot Corporation* v. *Baddour,* 394 Mass. 720, 721–22, 477 N.E.2d 399 (1985), is particularly persuasive because the governing statutes in Massachusetts are virtually identical to our own and because that court had previously determined, in *Dodd* v. *Commercial Union Ins. Co.,* 373 Mass. 72, 79, 365 N.E.2d 802 (1977), as have we, in *Mead* v. *Burns,* supra, that the state unfair trade practices act covered unfair insurance practices. The Massachusetts court noted that when Massachusetts had applied its unfair trade practices act to transactions not expressly subject to the FTC, it had done so in areas that had historically been subject to state rather than to federal regulation. It observed that federal law has largely superseded state regulation of securities transactions for the last fifty years or more. Like this court, it observed that state legislative history gave evidence that the private cause of action under the state unfair trade practices act was not intended to supersede the private cause of action provided in the state securities act. *Baddour* and its reasoning is on all fours with this case.

The decisions interpreting unfair trade practices in six other states likewise exclude securities transactions from the ambit of their unfair trade practices acts. See *Swenson* v. *Engelstad,* 626 F.2d 421, 428 (5th Cir. 1980) (applying Texas law); *In re Cantanella* v. *E.F. Hutton & Co. Securities Litigation,* 583 F. Sup. 1388, 1443 (E.D. Pa. 1984); *Taylor* v. *Bear Stearns & Co.,* 572 F. Sup. 667, 675 (N.D. Ga. 1983); *Skinner* v. *E.F. Hutton & Co.,* 314 N.C. 267, 274–75, 333 S.E.2d 236 (1985); *State* v. *Piedmont Funding Corporation,* 119 R.I. 695, 700, 382 A.2d 819 (1978); *State ex rel. McLeod* v. *Rhoades,*

275 S.C. 104, 106–107, 267 S.E.2d 539 (1980); contra *State ex rel. Corbin* v. *Pickrell,* 136 Ariz. 589, 667 P.2d 1304 (1983); *Kittilson* v. *Ford,* 23 Wash. App. 402, 595 P.2d 944 (1979), aff'd, 93 Wash. 2d 223, 608 P.2d 264 (1980). Although the underlying statutes in these cases contain provisions that concededly distinguish them from CUTPA, the ultimate holdings of the majority of the cases are consistent with the conclusion we reach today.

Consequently, the trial court's award of damages to the plaintiff was in error insofar as it allowed the plaintiff to recover compensatory damages, attorney's fees, and punitive damages under CUTPA. In point of fact, however, many of these items of damages were equally recoverable pursuant to the plaintiff's cause of action under CUSA. This duplication serves to validate the plaintiff's recovery of compensatory damages and of attorney's fees, and leaves reversible error only in his recovery of punitive damages, which must be set aside.

## II

The defendants' second claim of error involves a three-fold attack on the trial court's instructions to the jury. The defendants contend that the court: (1) inaccurately charged the jury on the issue of ratification; (2) erroneously refused to instruct the jury on the statute of frauds defense; and (3) improperly instructed the jury that it might draw an adverse inference from the defendants' failure to produce a particular witness.

## A

At trial, as a defense to the plaintiff's contract claim, the defendants argued that, even if the plaintiff had not originally authorized Reid's acquisition of 2000 shares of BESS stock, the plaintiff had ratified the purchase through his acquiescence. After receiving the trial court's instructions on the definition of ratification, the

jury rejected this defense and found that the defendants had broken their contract with the plaintiff.[11] On appeal, the defendants claim that the trial court erred in instructing the jurors that they could find that the plaintiff had ratified the transaction only if they first found that the plaintiff had had the opportunity to repudiate the purchase.

We find no error because the trial court's instructions comported with the meaning of ratification. We have frequently held that: "Ratification is defined as 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account.' Restatement (Second), 1 Agency § 82 (1958). Ratification requires 'acceptance of the results of the act with an *intent* to ratify, and with *full knowledge of all the material circumstances.*' (Emphasis added.) *Ansonia* v. *Cooper,* 64 Conn. 536, 544, 30 A. 760 (1894); see *Cohen* v. *Holloways', Inc.,* 158 Conn. 395, 411, 260 A.2d 573 (1969); *Bond Rubber Corporation* v. *Oates Bros., Inc.,* 136 Conn. 248, 251, 70 A.2d 115 (1949)." *Botticello* v. *Stefanovicz,* 177 Conn. 22, 28, 411 A.2d 16 (1979).

The defendants do not challenge the adequacy of the trial court's instruction on any of the three elements of ratification. Instead, they contend that the trial court, in effect, added a fourth prong to the definition of ratification by including in the charge the following two sentences: "Before the plaintiff can be held to have ratified acts of the defendants which you find to have initially been unauthorized [by] the plaintiff, it is essential that [the plaintiff] had the privilege and opportunity of repudiating the unauthorized transaction if he

---

[11] The court submitted to the jurors the following interrogatory to which they responded in the negative: "Did plaintiff Russell in his dealings with defendants Reid and Dean Witter Reynolds, Inc. during the period from April through July 1981, ratify the purchase of 2,000 shares of Basic Earth Science Systems, Inc. common stock on a margin basis?"

did not choose to ratify it. Thus, you must find that [the plaintiff] was given an opportunity to repudiate any transaction you find was unauthorized without any cost to [the plaintiff] or damage to [the plaintiff] as a result of the unauthorized transaction if he chose to repudiate it."

Review of this instruction in context compels the conclusion that it served not to create a fourth component of the definition of ratification, but rather to clarify the requirement that the jury may find that a party ratified a transaction only if the jury finds an intent to ratify it. The trial court gave the instruction in the course of explaining that the jury could infer an intent to ratify from the plaintiff's actions. The challenged instructions cautioned the jurors that they could not permissibly infer such an intent from the plaintiff's inaction if he lacked the ability by his action to undo the disputed transaction. We have emphasized in the past that the finding of a free and informed decision to ratify is a prerequisite to a finding of ratification. See *Botticello* v. *Stefanovicz,* supra, 29. The trial court's instruction in this case helped to ensure that the jury rendered a verdict that was consistent with this principle. Accordingly, we find that it was not defective.

## B

The defendants next contend that the trial court erred in refusing to instruct the jury that the statute of frauds afforded a defense to the plaintiff's claim that he had never agreed to the purchase of 2000 shares of stock in BESS. They argue that, because they sent the plaintiff a written confirmation of the 2000 share purchase, and because the plaintiff did not object in writing within ten days, the confirmation satisfied the statute of frauds for the sale of securities; General Statutes § 42a-8-319;[12] and bound the plaintiff to accept the

[12] "[General Statutes] Sec. 42a-8-319. STATUTE OF FRAUDS. A contract for the sale of securities is not enforceable by way of action or defense unless:

defendants' acquisition of 2000 shares of stock in BESS. We disagree.

The defendants' argument reflects a misunderstanding of the consequences of compliance with the statute of frauds. Under § 42a-8-319, a party may not enforce a contract that is subject to the statute of frauds without presenting specified written evidence of the existence of a contract. See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole,* 189 Conn. 518, 531–33, 457 A.2d 656 (1983). Satisfaction of the statute of frauds does not operate to bind the parties to the terms of the writing nor does it estop either party to challenge the existence of a valid contract. The existence of a written confirmation serves merely to preclude the parties from invoking the statute of frauds as a bar to the enforcement of the alleged agreement. See Conn. Gen. Stat. Ann. § 42a-2-201, comment 3 (West); White & Summers, Uniform Commercial Code (2d Ed. 1980) p. 55; see, e.g., *McCubbin Seed Farm, Inc.* v. *Tri-Mor Sales,* 257 N.W.2d 55, 58–59 (Iowa 1977).[13]

(a) There is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; (b) delivery of a certificated security or transfer instruction has been accepted, or transfer of an uncertificated security has been registered and the transferee has failed to send written objection to the issuer within ten days after receipt of the initial transaction statement confirming the registration, or payment has been made, but the contract is enforceable under this provision only to the extent of the delivery, registration or payment; (c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or (d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price."

[13] These authorities discuss the statute of frauds that appears in Article II of the Uniform Commercial Code and governs contracts for the sale of goods. General Statutes § 42a-2-210. We may look to these resources for

The jury could have considered the contents of the written confirmation, and the plaintiff's failure to object in writing, as evidentiary of the terms of an agreement between the plaintiff and defendants. Nevertheless, the court properly refused to instruct the jury that the plaintiff's failure to object in writing prevented him from challenging the enforceability of the provisions of the written confirmation.

## C

The defendants further claim that the trial court erred in instructing the jurors that they might draw an adverse inference from the defendants' failure to call Richard Blumencranz as a witness. Blumencranz was a branch manager for Dean Witter and, at the time of the transaction in question in this case, he served as Reid's supervisor. The plaintiff sought to call Blumencranz as a witness during his case-in-chief, but Blumencranz, who was out of the state at the time, did not appear. The plaintiff instead read several pages of Blumencranz's deposition testimony to the jury.[14] Later in the trial, Blumencranz came to Connecticut and testified on behalf of the defendants. The defendants did not permit him to testify before the jury, instead limiting his testimony to an explanation of complex securities regulations to the trial judge. When Blumencranz completed his statement, the court offered to allow the plaintiff to examine Blumencranz before the jury as his own witness. The plaintiff declined.

guidance in applying General Statutes § 42a-8-319 because the drafters of the code indicated that the purpose of § 42a-8-319 was "[t]o conform the statute of frauds provisions with regard to securities to the policy of the provisions in the Article on Sales (Article 2) on sale of goods." Conn. Gen. Stat. Ann. § 42a-8-319, comment: "Purposes of Changes" (West).

[14] The plaintiff claims that the deposition covered only a portion of the relevant subject matter that was within Blumencranz's competence as a witness.

In its instructions, the court charged that if the jury found that Blumencranz had been available during trial and that he had been a witness whom the defendants would naturally have produced, then the jury could permissibly have inferred from the defendants' failure to produce Blumencranz in their presence that Blumencranz's testimony would have been unfavorable to the defendants. The court then defined the term "witness whom the defendants would naturally have produced." It instructed the jury that Blumencranz had been available to the defendants and that the question of whether Blumencranz was a witness whom the defendant would naturally have produced was for them to resolve as finders of fact.

On appeal, the defendants claim that the trial court erred in so instructing the jury because: (1) Blumencranz did testify before the court; (2) Blumencranz, in effect, testified before the jury through his deposition; and (3) the plaintiff had an oppportunity to question Blumencranz before the jury when Blumencranz did appear in court.

We need not review these claims because the defendants did not properly raise them below. It is well established that parties who seek appellate review of claimed defects in jury instructions must distinctly bring these flaws to the attention of the trial court. *State* v. *Barrett,* 197 Conn. 50, 53 n.2, 495 A.2d 1044 (1985); *McKiernan* v. *Caldor, Inc.,* 183 Conn. 164, 166, 438 A.2d 865 (1981). In this case, the defendants' attorney, in the course of listing his exceptions to the court's charge, briefly mentioned his objection to the missing witness instruction in a single sentence.[15] This reference was insufficient

---

[15] The defendants' objection to the trial court's rendition of the missing witness instruction consisted of the following sentence: "The applicable rule is the Federal rule for margin violations and we object to the *Secondino* charge inasmuch as Mr. Blumencranz testified, whether by deposition or not."

to be of useful assistance to the court in determining whether the charge was inappropriate and in deciding whether to give a supplemental instruction to the jury. Consequently, the defendants, who were represented by experienced counsel at trial, failed adequately to preserve their claim of error on this issue. *State* v. *Barrett,* supra; see *State* v. *Jones,* 193 Conn. 70, 88, 475 A.2d 1087 (1984).

Even if we were to reach the merits on this question, we are not persuaded by the defendants' claim that the trial court committed plain error in giving the missing witness instruction. We have held on numerous occasions that the trial court may appropriately instruct the jury that it may draw an adverse inference from a party's failure to call a witness who was available and who was a witness whom the party would naturally have produced. *Shelnitz* v. *Greenberg,* 200 Conn. 58, 73, 509 A.2d 1023 (1986); *State* v. *Hart,* 198 Conn. 424, 428, 503 A.2d 588 (1986); *State* v. *Alfonso,* 195 Conn. 624, 631, 490 A.2d 75 (1985); *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960). "A witness who would naturally be produced by a party is one who is known to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce." *Secondino* v. *New Haven Gas Co.,* supra.

The trial court in this case did not instruct the jury to draw an adverse inference nor did it tell the jurors that the circumstances of the case permitted such an inference. The court merely instructed the jurors that they could permissibly draw an adverse inference if they first found that the prerequisite conditions existed. The defendants do not question Blumencranz's availability nor do they contend that a jury could not reasonably have found him to be a witness whom they naturally

would have produced. Instead, they argue that the instruction was inappropriate because Blumencranz did appear at trial and because Blumencranz was also available to the plaintiff. These arguments, however, ignore the focus of the inquiry into the propriety of the missing witness charge. It is the party's decision to withhold the testimony of an available witness whom it would naturally have produced that permits the jury to draw an adverse inference. *Secondino* v. *New Haven Gas Co.*, supra, 674–75. Thus, it is irrelevant that another party introduced the missing witness's deposition testimony; see *Halpine* v. *Halpine,* 138 Conn. 578, 580–82, 87 A.2d 146 (1952); cf. *Sileo* v. *Curran,* 161 Conn. 572, 573, 290 A.2d 325 (1971); or that the witness testified to the court on issues that were immaterial to the jury's inquiry, or that the witness was also available to other parties. See *Kelsey* v. *Connecticut State Employees Assn.,* 179 Conn. 606, 616, 427 A.2d 420 (1980); *Zack* v. *Guzauskas,* 171 Conn. 98, 102, 368 A.2d 193 (1976); *Secondino* v. *New Haven Gas Co.,* supra, 676. In this case, the defendants did not present Blumencranz to the jury. If the jury concluded that he was a witness whom the defendants would naturally have produced, it could permissibly have drawn an adverse inference from the defendants' failure. The trial court, therefore, properly instructed the jury.

## III

In their third claim, the defendants argue that the trial court erroneously admitted evidence of Reid's prior misconduct when it permitted two of Reid's former clients, Frank McDonnell and James Kleinkauf, to testify that Reid had made several unauthorized purchases of stock on their behalves. We find no error.

We may usefully begin our inquiry on this issue by restating the two-step analysis that a trial court must conduct in deciding whether to admit evidence of a

party's collateral misconduct. The court first must determine whether the evidence is relevant and material to an issue properly before the court. *State* v. *Shindell,* 195 Conn. 128, 134, 486 A.2d 637 (1985). " 'Evidence of other misconduct, although not ordinarily admissible to prove the bad character or criminal tendencies of the accused, may be allowed for the purpose of proving many different things, such as intent, identity, malice, motive or a system of criminal activity'; *State* v. *Ibraimov,* 187 Conn. 348, 352, 446 A.2d 382 (1982) . . . ." *State* v. *Shindell,* supra, 133. Second, after a finding that the evidence is relevant, the trial court must then decide whether its admission is warranted because its probative value outweighs its prejudicial effect. Id., 134; *State* v. *Braman,* 191 Conn. 670, 676, 469 A.2d 760 (1983).

In this case, the defendants concede that the trial court conducted an appropriate inquiry. They acknowledge that the court below found that the testimony of McDonnell and Kleinkauf was relevant to the issue of Reid's fraudulent intent and that the probative value of the witnesses' testimony exceeded its prejudicial effect. On appeal, the defendants limit their claim to an attack on these findings.

Because of the latitude we accord trial courts on questions of relevance; *State* v. *McIntosh,* 199 Conn. 155, 163, 506 A.2d 104 (1986); *State* v. *Sharpe,* 195 Conn. 651, 657, 491 A.2d 345 (1985); and " '[b]ecause of the difficulties inherent in [the process of balancing probative value and prejudicial effect], the trial court's decision [to admit evidence of other misconduct] will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, "every reasonable presumption should be given in favor of the trial court's ruling." *State* v. *Ryan,* [182 Conn. 335, 337, 438 A.2d 107 (1980)]. ' *State* v. *Howard,* [187 Conn. 681, 685,

447 A.2d 1167 (1982)]." *State* v. *Shindell,* supra, 136, quoting *State* v. *Braman,* supra, 676–77; *State* v. *Howard,* supra.

Applying this standard to the facts of this case, we conclude that the trial court properly admitted the testimony of Kleinkauf and McDonnell. In light of the close correspondence in time and character between Reid's conduct toward the plaintiff and his conduct toward these witnesses, and in light of Reid's disavowal of any intent to deceive the plaintiff, the trial court could reasonably have found the testimony of Kleinkauf and McDonnell material to the issue of Reid's motive and fraudulent intent. See *State* v. *Esposito,* 192 Conn 166, 171–72, 471 A.2d 949 (1984); see also *McLaughlin* v. *Thomas,* 86 Conn. 252, 259–60, 85 A. 370 (1912); *Hoxie* v. *Home Ins. Co.,* 32 Conn. 21, 37 (1864). Similarly, the court did not abuse its discretion in finding that the probative value of the testimony outweighed its prejudicial effect. Indeed, the defendants have established no basis for a determination by this court that the admission of the testimony resulted in undue prejudice. The court sought to minimize any possible prejudice by instructing the jury that it could consider the testimony only as evidence of Reid's fraudulent intent and that it could not infer from the testimony that Reid possessed a propensity for dishonesty.[16] The defendants' claim of prejudice is further undercut by the fact that the jury, after hearing the testimony, returned a verdict in favor of the defendants on the claim of fraud. See *State* v. *Nardini,* 187 Conn. 513, 529, 447 A.2d 396 (1982). In the absence of a demonstrated likelihood of

---

[16] The plaintiff argues that the trial court erred in permitting the jury to consider the testimony of Kleinkauf and McDonnell only with respect to his claim of fraud. Because the plaintiff prevailed on each of his other claims at trial and because the plaintiff has presented no evidence that the trial court abused its discretion in limiting the jury's use of this testimony, we find no error in the court's ruling.

undue prejudice, we cannot say that the trial court erred in admitting the testimony of Kleinkauf and McDonnell.[17]

## IV

The defendants' final claim is that the trial court awarded the plaintiff excessive attorney's fees. At the conclusion of trial, the court held the defendants liable for the plaintiff's attorney's fees under the relevant provision of CUSA. General Statutes § 36-498.[18] After reviewing billing records submitted by the plaintiff's attorney, the court determined the appropriate amount of this award to be $42,294.75. On appeal, the defendants contend that this sum should be reduced because: (1) the plaintiff did not prevail on all of his claims; (2) the award was unreasonable in light of the compensatory damages the plaintiff obtained; and (3) the trial court assigned unrealistically high values to certain services provided by the plaintiff's counsel. We disagree.

The defendants first argue that the award was excessive as a matter of law because the fees that the trial court allowed improperly included amounts allocable to the plaintiff's unsuccessful claims of fraud and violation of CUTPA. This argument is unpersuasive because it erroneously assumes that, under § 36-498, an award of attorney's fees must automatically be reduced if its recipient fails to prevail on all of his claims at trial. We have no such rule. A plaintiff may recover "reasonable attorney's fees" under § 36-498 only if he prevails on

---

[17] The defendants also claim that the trial court erred in considering the testimony of Kleinkauf and McDonnell when it determined the amount of punitive damages to award the plaintiff under CUTPA. Since we have already held that CUTPA does not apply in this case, we need not consider this claim.

[18] The trial court also held the defendants liable for an identical amount in attorney's fees under CUTPA. In light of our ruling in part I, supra, the defendants are not liable to the plaintiff for attorney's fees under CUTPA.

his § 36-498 claim. The magnitude of the amount awarded to a victorious party rests within the sound discretion of the trial court. See *Kenny* v. *Civil Service Commission,* 197 Conn. 270, 277–78, 496 A.2d 956 (1985); *Moffitt* v. *Horrigan,* 37 Conn. Sup. 873, 876, 441 A.2d 207 (1982). Where a party succeeds on his § 36-498 claim, but fails on other claims brought in the same suit, the size of his award should reflect his success, as determined by the trial court, in securing redress for the injuries that prompted his § 36-498 claim and reasonable legal cost incurred in pursuing this success. See *Hensley* v. *Eckerhart,* 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). In this case, the plaintiff sought relief, on five separate legal theories, for losses he had sustained as a result of a transaction that the defendants had arranged. He succeeded in this endeavor by prevailing on three of the five related counts.[19] Because the amounts he expended on litigation, including the dollars spent on his unsuccessful claims, were devoted to the pursuit of a goal that he achieved, the trial court permissibly rejected the defendants' demand that it reduce the award by two-fifths.

The defendants also urge us to hold that the award was unreasonable because it exceeded the amount of compensatory damages that the plaintiff recovered. The trial court ordered the defendants to pay $42,294.75 in attorney's fees, while holding the defendants liable for only $18,120.09 in compensatory damages. This difference by itself, however, does not compel us to disturb the trial court's judgment. Section 36-498 provides for the recovery of attorney's fees in order

---

[19] The trial court awarded the plaintiff full compensatory damages on his contract, CUSA, and CUTPA claims and compensatory damages discounted by 10 percent for comparative negligence on his negligence claim. Because each amount reflected damages awarded to compensate for the same injury, the parties stipulated "that the plaintiff [would] have recovery on one count only, at his election as to which count . . . ."

to encourage the enforcement of CUSA by victims of improper securities transactions who might not otherwise be able to afford to do so. See Rodriguez, "Recovery of Attorneys' Fees in Consumer Contract Actions in Connecticut," 1 Bridgeport L. Rev. 55, 62–63 (1980). It reflects a legislative recognition that suits under CUSA are often long, complex, and prohibitively expensive for individual investors. The defendants in this case have offered this court no reason to conclude that attorney's fees that exceed compensatory damages are presumptively unreasonable. Indeed, the relative size of the award in this case tends to support the proposition that the recovery of attorney's fees is necessary to make the enforcement of CUSA economically feasible.

Finally, the defendants attack the method the trial court used to calculate the attorney's fees that it awarded. They claim that the court should have assigned a lower hourly billing rate to time spent by the plaintiff's attorney working on administrative and nonlegal tasks. Because the defendants in their brief do not specifically describe the allegedly overvalued tasks or even mention the size of the hourly rate employed by the trial court, they have failed to provide sufficient information to allow us to evaluate the reasonableness of the trial court's calculation. See *Taylor* v. *American Thread Co.*, 200 Conn. 108, 509 A.2d 512 (1986); *Bieluch* v. *Bieluch*, 199 Conn. 550, 552, 509 A.2d 8 (1986); *In re Final Grand Jury Report Concerning the Torrington Police Department*, 197 Conn. 698, 715, 501 A.2d 377 (1985); *State* v. *One 1977 Buick Automobile*, 196 Conn. 471, 480, 493 A.2d 874 (1985). In the absence of any such presentation in support of the defendants' argument, we cannot say that the trial court's methods were clearly erroneous.[20]

[20] The plaintiff remains free on remand to petition the trial court to order the defendants to pay the litigation costs he has incurred in defending this appeal.

There is error in part, the judgment is set aside and the case is remanded with direction to modify judgment in accordance with this opinion.

In this opinion the other justices concurred.