[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO SET ASIDE VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT (#126)
The jury returned Answers to Interrogatories (#120); Plaintiffs' Verdict for South Seas of New Haven, Inc. on Breach of Contract count in the amount of $254,000.00 (#121); Plaintiffs' Verdict for Wayne Eng and Susan Eng on Breach of Duty of Good Faith and Fair Dealings in the amount of $71,000.00 (#122); Plaintiffs' Verdict for South Seas of New Haven, Inc. on Breach of Duty of Good Faith and Fair Dealings in the amount of $3,000.00 (#123); Plaintiffs' Verdict for Susan Eng and Wayne Eng on Unfair Trade Practice Claim in the amount of $52,000.00 (#124); and Plaintiffs' Verdict for South Seas of New Haven, Inc. on Unfair Trade Practice claim in the amount of $00.00 (#125).
Each of the above enumerated documents identifies "defendants" as Tower Realty Associates and Murray Leifer and Ruben Schron. (##120, 121, 122, 123, 124 and 125).
The file contains a "Counterclaim" (#107) and "Answer to Counterclaim" (#108). The trial attorney verbally withdrew the Counterclaim and promised to file a proper "withdrawal" to clear the computer control on this file. To date a proper "Withdrawal of Counterclaim" is not in the file.
The jury's participation ended January 28, 1993. The parties sought and received transcripts of the trial. A proper motion was filed and granted to extend the time to file briefs on all motions.
The file indicates that defendants filed their Motion to Set Aside Verdict and Motion for Judgment Notwithstanding the Verdict on January 29, 1993 (#126). An application for a Prejudgment Remedy was filed on February 25, 1993 and subsequently granted.
Defendants filed their Memorandum in Support of their Motion to Set Aside the Verdict and Motion for Judgment Notwithstanding the Verdict, together with their "Appendix" on April 29, 1993. Plaintiffs filed their Memorandum in Opposition to Motion to Set Aside Verdict, Motion for Judgment and for Attorneys' Fees, and CT Page 6697 Memorandum in Support of Plaintiffs' Motion for Attorneys' Fees on May 10, 1993. Defendants' Reply to Plaintiffs' Memorandum in Opposition to Motion to Set Aside the Verdict, Motion for Judgment Notwithstanding the Verdict, and Defendants' Opposition to Plaintiffs' Motion for Judgment and for Attorneys' Fees were filed on June 1, 1993.
These motions were argued on June 7, 1993.
The plaintiffs, South Seas of New Haven, Inc., orally waived any right to the verdict in its favor in the sum of $3,000.00 on its claim of Breach of Duty of Good Faith and Fair Dealings.
Defendants moved for directed verdicts after the close of the plaintiffs' case in chief. P.B. 321. Zarembski v. Three Lakes Park, Inc., 177 Conn. 603, 604 (f.n. 1) (1979).
Defendants predicate their Motion to Set Aside Verdict and Motion for Judgment Notwithstanding the Verdict on three reasons: (1) the verdicts are against the evidence, (2) the verdicts are contrary to law, and (3) the damages are excessive (#126).
Each side presented their unilateral interpretation of the testimony and material or physical evidence to the jury. The jury presented 5 communications (Court's Exhibits B2, C3, D4, E5 and F6) to the court and trial attorneys during deliberations. The jury adequately and clearly considered and answered five and one-half pages of interrogatories and returned the above enumerated five verdicts. Considering the trial in its entirety, i.e. pleadings, evidence, summations, charge in its entirety, questions by the jury, interrogatories and verdicts returned, the jury was properly guided to an appropriate award of damages.
The threshold issue in this case focuses on the tension between a litigant's constitutional right to have issues of fact determined by a jury and the trial court's legal discretion to overturn a verdict(s) in order to prevent a manifest injustice. Jacobs v. Goodspeed, 180 Conn. 415, 416 (1980); Barbieri v. Taylor, 37 Conn. Sup. 1 (1980).
 "In order to determine whether the verdict should be set aside the `evidential underpinnings' of the verdict must be examined.'" CT Page 6698
Jacobs at 417; Barbieri at 4, supra.
Plaintiffs' Exhibit B, 11 page, "Lease Extension and Modification Agreement" sent by defendants to plaintiffs on or about April 14, 1980, and plaintiffs' Exhibit C, 2 page letter dated June 18, 1989, from attorneys Tobin Levin to defendants "RE: Lease Extension and Modification Agreement South Seas of New Hven [Haven] Inc." are the "evidentiary underpinnings" and/or foundation of defendants' primary reasons for setting these verdicts aside as against the evidence and contrary to law.
Both exhibits are and must be incorporated herein by reference in view of the respective claims of the parties, i.e. (1) defendants' claim that as a matter of law the court was solely responsible to determine whether Exhibit C was a counteroffer and consequently a termination and rejection of the offer expressed in Exhibit B, or (2) plaintiffs' claim that Exhibit C was ambiguous and presented a question of fact for the jury to decide the intention of the parties.
Defendants argue that (1) Exhibit B as a matter of law expressed an offer, (2) that offer was rejected by Exhibit C as a matter of law, and (3) as a result the offer terminated. Plaintiffs argue that Exhibit C is ambiguous and framed issues of fact for decision by the jury via interrogatories.
Exhibit C contains no mandatory terms and on its face does not express or state what the consequences or effect shall be of a failure to conform to its provisions. What is clearly manifested in Exhibit C? It does not clearly appear from the language used in Exhibit C that a counteroffer was intended, or that Exhibit B was rejected.
Exhibit C employs the word "should" nine times. That word can be specially used to denote duty, propriety or efficiency. It can mean "shall" or "must". Used in conjunction with such words and phrases as "for review", "may be in a position to execute this document", "requested", "at an agreed rate", "be required", "omit. . .", "references to an increase", "requested modifications" and "adjusted document for execution". Exhibit C's value and significance as "evidential underpinnings" is far from clear.
Defendants' self-serving conclusion that Exhibit C rejected the offer of Exhibit B and created a counteroffer cannot be CT Page 6699 imputed nor inferred as the above quoted words and phrases are not plain and clear, either as a rejection or a counteroffer.
Defendants cite Jordan Marsh Co. v. Patterson, 67 Conn. 473
(1896), and Libero v. Lumbermen's Mut. Cas[.] Co., 143 Conn. 269,274 (1956), as authority for the claim that the interpretation of Exhibit C was a legal question for the court. Jordan Marsh involved an offer, acceptance and consideration, i.e. a contract acknowledged as such by that defendant, viz: letter from Patterson to Jordan Marsh, stating
 "Gentlemen. We are in receipt of the following contracts for which we thank you." (underlining added.) (pg. 477).
Libero involved an insurance policy, i.e. a contract.
Exhibit C, Tobin's letter of June 18, 1987, is a response to an offer from defendants. It is not an acceptance. There was no contract on June 18, 1987. Exhibit C presents "evidential underpinnings" and extrinsic facts in a series of negotiations between the parties ultimately resolved by the jury in the verdicts and interrogatories returned as on file.
Negotiations between the parties continued and provided "evidentiary underpinnings" of record that included negotiation by plaintiffs for and receipt of a loan for $150,000.00 from the Union Trust Company. The Engs (Mr. Mrs.), Mr. Leifer and Mr. Hawley of the bank, contributed to further these negotiations. Betty Zdanowich, the former property manager for defendants, and the niece of the Engs, also were involved in negotiations for and on behalf of the parties. Discussions and negotiations concerned "evidencial underpinnings" of rent of over $90,000.00 a year reduced to $51,840.00, renovations, a verbal agreement and hand shake "to indicate agreement upon the terms of a new lease between Mr. Eng and Mr. Leifer", Mr. Eng renewing negotiations with Mr. Leifer, executing the original proposed lease agreement, and forwarding a security deposit to Mr. Leifer, continued negotiations.
Mr. Eng commenced separate negotiations to sell the restaurant and committed the bulk of the bank loan to other personal purposes. Mr. Eng's negotiation with the potential buyer never matured into a contract. The buyer executed a notice of intention to purchase the restaurant. This document contained CT Page 6700 nine separate conditions. The buyer testified and these "evidential underpinnings" went before the jury for their consideration and deliberation. There was no contract or agreement or meeting of the minds. No sale. Another attempt to negotiate a new lease failed in February of 1988 and this lawsuit was filed.
 "It is an undeniable principle of the law of contracts. . . that an offer of a bargain, by one person, to another, imposes no obligation upon the former, until it is accepted by the latter, according to the terms in which the offer was made. Any qualification of, or departure from, those terms, invalidates the offer, unless the same be agreed to, by the person who made it. Until the terms of the agreement have received the assent of the parties, the negotiation is open, and imposes no obligation on either." (Underlining added).
The Ocean Insurance Company v. Carrington, 3 Conn. 357, 363
(1820, Hosmer Ch. J.)
Defendants' Memorandum in Support of its motion to Set Aside the Verdict and Motion for Judgment Notwithstanding the Verdict, dated April 29, 1993, page 15 et seq., fails to recognize the impact of the above underlined complete quotation of Hosmer, Ch. J. and the "evidentiary underpinnings" of continued negotiation of the parties.
Defendants' self-serving conclusion that Tobin's letter "did not mean what it said, and that it meant something it did not say" presented no such dilemma to the jury in finding via Interrogatory 2 "that the letter of Attorney Tobin of June 18, 1987 was a request for changes as distinguished from a counteroffer."
The jury concluded this crucial issue in favor of the plaintiffs. The evidence, circumstances of the parties and answers to interrogatories clearly support the verdicts, all of which are reasonably and legally reached. Issues of ambiguities, credibility and inferences are the function of the jury. CT Page 6701
Defendants argue that the instructions to the jury were not explicit in certain respects, i.e. correct in law, adapted to the issues and sufficient for the guidance of the jury.
 "In assessing the adequacy of a charge to the jury, we consider the charge in its entirely, and judge it by its total effect rather than by its individual component parts. . . . We consider whether the instructions are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury. The charge must give the jury a clear comprehension of the issues presented for their determination of those issues. . . . The test is whether the charge as a whole fairly presented the case to the jury so that no injustice was done under established rules of law."
Goodmaster v. Houser, 225 Conn. 637, 644-645 (1993).
Defendants' speculation and self-serving claim that the jury "easily could have concluded. . ." "and, therefore could well have concluded. . . erroneously" overlooks the fact that the jury was properly charged and that the court and attorneys were available to answer any questions they might have. That was explicit in the charge. The jury, in fact, submitted five questions to the court and attorneys.
Defendants have attempted to pick, choose, isolate and dissect the component parts of the charge.
The jury answered six pages of interrogatories and returned five verdicts, all properly coordinated, indicating that they unanimously agreed on the evidence and facts they found. Defendants' allegations of "uncertain and speculative evidence" invades the province of the determination of facts and the credibility of the witnesses by the jury, alone. The jury alone draws the inferences. The court cannot second guess the jury on these functions, nor can the parties. Questions of intent, inferences of fact, ambiguities, good faith and fair dealings, unjust or unfair result, knowledge of impending sale, attempt to CT Page 6702 double the rent, fairness, immoral, unethical, oppressive or unscrupulous conduct, etc., have been appropriately considered and decided by the jury.
As an attorney and experienced real estate owner and investor, Mr. Leifer testified before the jury. The jury surely considered his experience and the facts. The issue of forseability [foreseeability] of damages and options of the parties on that issue and the inferences, logically and reasonably, to be drawn therefrom were addressed by the jury. He knew and was aware of plaintiffs' weakened financial condition and bank loan. The jury obviously concluded that there was sufficient evidence to support their unanimous finding on the issue of his forseability [foreseeability] of damages as awarded. (See L. F. Pace Sons Inc. v. Travelers Indemnity Co., 9 Conn. App. 30, 40 (1986). Testimony concerning the proposed sale and the negotiations about price of the plaintiffs' business provided evidence of fair market value on which to predicate damages, if any, for the consideration of the jury.
There was no lease extension ever executed by the parties. The business could not be sold absent a lease. Defendants' claim that Mr. Eng should have salvaged the sale by negotiating a lease extension at a higher rate to fulfill that condition of sale is without merit. The jury decides issue of fact, not "should have." The jury's answers to interrogatories indicate their unanimous [unanimous] conclusion that the defendants breached the contract and duties as stated therein and "caused" the damages awarded. The jury instructions made three references that harm or damage to plaintiffs must have been "proximately caused" by defendants' breach of duty or conduct.
In Interrogatory 4 the jury found that defendant Leifer breached the duty of good faith and fair dealing with respect to subsequent lease negotiations with South Seas of New Haven, Inc., and in Interrogatory 10(A) assessed damages suffered at $3,000.00. The attorney for plaintiff waived any and all claims for this sum at oral argument on these motions. The judgment must reflect that fact.
In Pisel v. Stamford Hospital, 180 Conn. 314, 342, 343
(1980), our basic laws on excessive verdicts are recorded, as is the ultimate test which must be applied in assessing excessiveness. CT Page 6703
The verdicts returned do not "so shock(s) the sense of justice as to warrant the court's interference."
 "The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption."
The jury found that Mr. Leifer either knew or should have foreseen that the Engs would assume personal financial liability as regards the loan with Union Trust (Interrogatory 5), and that the Engs suffered $71,000.00 damages because of defendants' breach of the duty of good faith and fair dealings (Interrogatory 10(B)), and that punitive damages in the case are appropriate (Interrogatory 11).
Defendants claim, in effect, that the jury had no basis for either, any or all of its findings (Interrogatories 5, 10(B) or 11).
The jury observed the parties and other witnesses in court under direct and cross examination. The jury was the sole judge of credibility and the weight to be given to testimony based on the demeanor of those testifying.
Defendants question the jury's verdicts and interrogatories returned by attempting to characterize the evidence as "insufficient". Plaintiff characterizes the same evidence as "ample".
Based on evidence that "the wrench was defective in that it was worn and would not hold", the Supreme Court ruled that the jury could reasonably have found that the defect in the wrench was a substantial factor in producing the plaintiff's injury." Minicozzi v. Atlantic Refining Co., 143 Conn. 226, 231 (1956). The evidence of record reasonably supports the factual predicates of the answers to interrogatories and verdicts returned.
Defendants recite quotations of various witnesses and CT Page 6704 present them as factual predicates to foster their theories regarding causation, credibility, sufficiency of evidence and conclusions by the jury.
 "Question regarding the existence of a causal link classically are reserved for determination by the trier of fact."
Sharp v. Wyatt, Inc., 31 Conn. App. 824, 835 (1993).
Here, again, the evidence must be weighed in its entirety, and judged by its total effect rather than by its individual component parts.
The jury found that: (1) Mr. Leifer knew or reasonably should have foreseen that the Engs would assume personal financial liability as regards the loan with Union Trust, (2) that the Engs suffered $71,000.00 damages because of the breach of the duty of good faith and fair dealings, and (3) that punitive damages are appropriately founded on the breach of the duty of good faith and fair dealings. (Interrogatories 5, 10(b) and 11).
The charge stated:
 "With respect to the duty of good faith and fair dealings the plaintiffs have also sought punitive damages for the breach of this obligation. If you find that the defendants did breach this duty you are instructed that while punitive damages are generally not available in an ordinary breach of contract case they might be available if you find that the defendants' actions were motivated by bad faith. In this case, should you find that there was a breach of this duty of good faith and fair dealings you should evaluate whether the plaintiffs have also proven a wreckless indifference on the part of the defendant or an intentional and wanton violation of these rights. In other words, was the breach of this duty aggravated by particularly egregious conduct on the part of the defendants. Should you find that punitive damages are appropriate the amount of such damages will be set by the Court." CT Page 6705
The above quotation properly instructed the jury to "evaluate" the issue of fact framed by the pleadings and evidence with respect to "the duty of good faith and fair dealings".
It is the duty of this court to accept the findings of the jury as above stated and to sustain this verdict as returned absent proper cause or reason to interfere.
The jury found that (1) the defendants engaged in unfair and deceptive practices, (2) that the Engs were individually harmed by these unfair and deceptive practices, and (3) that the amount of damages that were suffered by Wayne and Susan Eng (having found that the defendants engaged in unfair and deceptive practices) amounted to $52,000.00. (Interrogatories 6, 8 and 12(B)).
Defendants claim that no basis exists for finding CUTPA liability. The trial court concluded that the plaintiff had stated a cause of action under CUTPA because of the broad sweep of CUTPA's coverage of unfair or deceptive acts or practices "in the course of any trade or commerce". See Russell v. Dean Witter Reynolds, Inc., 200 Conn. 172, 177 (1986).
No case law has been cited to exclude the facts of this case from the application and coverage of CUTPA.
Favorable construction must be accorded to jury findings absent a mistake of law or some other valid basis for refuting the result other than a difference of opinion regarding the conclusions to be drawn from the evidence. If there is a reasonable basis in the evidence for the jury's verdicts, courts should let the jury work its will.
The claims of the defendants to (1) set aside the verdicts, and (2) for judgment notwithstanding the verdicts as (1) against the evidence, (2) contrary to the law, and (3) as excessive, are denied and the court finds that the jury could reasonably and logically reach their conclusions as set forth in the interrogatories and verdicts returned.
John N. Reynolds State Trial Referee CT Page 6706