21-1916-cv (L)
Tarpon Bay Partners LLC v. Zerez Holdings Corporation

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2022
Nos. 21-1916-cv, 21-2010-cv

TARPON BAY PARTNERS LLC,
*Plaintiff–Consolidated Defendant–Counterclaim Defendant–Appellant–*
*Cross-Appellee,*

STEPHEN M. HICKS,
SOUTHRIDGE ADVISORS II, LLC, a Delaware limited liability company,
*Consolidated Defendants–Counterclaim Defendants–Appellants–*
*Cross-Appellees,*

*v.*

ZEREZ HOLDINGS CORPORATION, an Oklahoma corporation, FKA
DEFINITIVE REST MATTRESS COMPANY,
*Defendant–Consolidated Plaintiff–Counterclaim Plaintiff–Appellee–*
*Cross-Appellant,*

DOES, 1–25,
*Consolidated Defendants–Counterclaim Defendants–Appellees.*[*]

Appeal from the United States District Court
for the District of Connecticut

ARGUED: MARCH 3, 2023
DECIDED: AUGUST 11, 2023

---

[*] The Clerk of Court is respectfully directed to amend the caption accordingly.

Before: NARDINI, MERRIAM, *Circuit Judges*, and KATZMANN,[1] *Judge*.

_____

Plaintiff-Appellant Tarpon Bay Partners LLC ("Tarpon Bay") and Defendant-Appellee Zerez Holdings Corporation ("Zerez") attempted to reach an investment deal in which Tarpon Bay would purchase Zerez's debt obligations and, in return, receive stock in Zerez pursuant to section 3(a)(10) of the Securities Act of 1933. As part of this attempt, Zerez issued a promissory note that allowed Tarpon Bay to convert $25,000—the signing fee for the attempted transaction—into Zerez's common stock at a 50 percent discount in stock price. After the deal broke down, Tarpon Bay demanded more than 278 million shares worth nearly $2.23 million on the date of conversion. Zerez refused to issue the shares.

Tarpon Bay sued Zerez to enforce the note, and Zerez countersued Tarpon Bay, Southridge Advisors II, and Stephen Hicks (together, "Counterclaim Defendants"). On Tarpon Bay's motion for summary judgment, the United States District Court for the District of Connecticut (Underhill, *J.*) held that although genuine issues of material fact remained as to whether the note lacked consideration, the note was unconscionable as a matter of law and therefore unenforceable. On Zerez's later motion for summary judgment on its counterclaims, the district court held in relevant part that Zerez was not entitled to relief under the Connecticut Unfair Trade Practices Act ("CUTPA"). Tarpon Bay appeals and Zerez cross-appeals from the final judgment.

We first vacate the district court's holding that the note was unconscionable as a matter of law on the record before it at summary judgment. We next conclude the district court correctly determined that genuine issues of material fact remained as to whether

_____

[1] Judge Gary S. Katzmann, of the United States Court of International Trade, sitting by designation.

consideration supported the note. Finally, we affirm the district court's grant of summary judgment for the Counterclaim Defendants on CUTPA on the alternative ground that CUTPA does not apply to the case at bar. We **VACATE** in part, **AFFIRM** in part, and **REMAND** for further proceedings consistent with this opinion.

GEORGE O. RICHARDSON, III, Sullivan & Worcester LLP, New York, NY, *for Plaintiff–Appellant and Counterclaim Defendants–Appellants*.

JONATHAN M. SHAPIRO, (Evan K. Buchberger, *on the brief*), Aeton Law Partners, Middletown, CT, *for Defendant–Cross-Appellant*.

GARY S. KATZMANN, *Judge*:

Before us are the appeal of Plaintiff-Appellant Tarpon Bay Partners LLC ("Tarpon Bay") and cross-appeal of Defendant-Appellee Zerez Holdings Corporation ("Zerez") from the Judgment of the United States District Court for the District of Connecticut. Tarpon Bay and Zerez are commercial parties who regularly transact in the capital markets and attempted to reach an arm's-length investment deal. After the deal broke down, Tarpon Bay sued to

3

enforce an allegedly valid promissory note issued by Zerez (the "Signing Fee Note"). Among other defenses and counterclaims, Zerez raised the defense of unconscionability and counterclaimed that Tarpon Bay, Southridge Advisors II, LLC ("Southridge"), and Stephen M. Hicks ("Hicks") (together, "Counterclaim Defendants") had violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a to -110q.

In September 2019, the district court denied summary judgment for Tarpon Bay on its enforcement claims because genuine issues of material fact remained as to whether the Signing Fee Note was supported by consideration. It then held in the same opinion that the Signing Fee Note was unconscionable and therefore unenforceable. Tarpon Bay challenges these two holdings on appeal. In July 2021, the district court granted summary judgment for Tarpon Bay on Zerez's CUTPA counterclaim, which Zerez challenges on

cross-appeal.

We first hold that the record at the summary judgment stage did not establish that the Signing Fee Note was unconscionable under Connecticut law. We next hold that the district court correctly denied summary judgment for Tarpon Bay on its enforcement claims. Finally, we hold that the district court's grant of summary judgment on Zerez's CUTPA claim was warranted on the alternative grounds that CUTPA does not apply to the case at bar. Accordingly, we **VACATE** in part, **AFFIRM** in part, and **REMAND** for further proceedings consistent with this opinion.

## I.    Background

### A.    Factual Background

Unless otherwise stated, the parties do not dispute the following facts. Zerez and Tarpon Bay are sophisticated commercial parties who are routine players in the capital markets. Zerez is a publicly traded holding company, formed in Oklahoma and operated out of California, that invests in and manages emerging technology

5

businesses.  Joint App'x at 867, 915, 1149.  Trading at fractions of a

cent, Zerez's common stock is a penny stock listed on the over-the-

counter ("OTC") market under the stock symbol "SCNA."[2]  *Id.* at 867,

870.  Tarpon Bay is a Florida limited liability company managed by

Southridge, an investment advisory firm based in Connecticut and

headed by Hicks.  *Id.* at 867–68, 874.

In January 2016, Zerez sought new capital to fund its continued

---

[2] OTC "securities are securities not listed on a national securities exchange."  *Over-the-Counter (OTC) Securities*, Investor.gov, https://www.investor.gov/introduction-investing/investing-basics/glossary/over-counter-otc-securities (last visited Aug. 10, 2023).  And microcap stocks, commonly referred to as "penny stocks," refer to shares in "companies with low or micro market capitalizations. . . . of less than $250 or $300 million."  *Microcap Stock*, Investor.gov, https://www.investor.gov/introduction-investing/investing-basics/glossary/microcap-stock (last visited Aug. 10, 2023).

Due to the very low price, and to the lack of disclosure requirements that are generally applicable to securities listed on national exchanges, penny stocks on the OTC market are typically highly volatile in price and generally illiquid.  *See* Joshua T. White, U.S. SEC, *Outcomes of Investing in OTC Stocks* 8–9 (Dec. 16, 2016), https://www.sec.gov/files/White_OutcomesOTCinvesting.pdf.  Because it can be difficult to find a buyer, parties holding penny stock often cannot sell shares quickly without lowering the price.

As of August 10, 2023, SCNA trades at $0.0007 per share.  *See SCNA*, OTCMarkets, https://www.otcmarkets.com/stock/SCNA/overview (last visited Aug. 10, 2023).  Zerez changed its name to "Smart Cannabis Corp." in September 2017.  *See* Joint App'x at 972.

operations and growth. *Id.* at 1150. The company had more than $500,000 of debt on its books, so it entertained offers from fundraising brokers to provide or procure new capital in exchange for stock or other debt. *Id.* Juan Carlos Murga, Zerez's then-CEO, was in contact with individuals from several venture capital and investment funds but ultimately proceeded with Anish Aswani of Southridge.[3] *Id.* at 1149–51. The parties dispute how they were initially put in touch.[4] However it happened, Aswani and Murga engaged in discussions that Tarpon Bay would purchase Zerez's debt obligations and, in exchange, receive a commensurate amount of stock in Zerez. *Id.* at 915–16, 1296. The transaction would reduce Zerez's carried debt and make the company more attractive for future lenders or investors. *Id.* at 916, 1296. Because Zerez would need to issue equity in exchange

---

[3] Aswani was an employee who negotiated with Zerez on behalf of Southridge and Tarpon Bay. *Id.* at 928.

[4] Tarpon Bay alleges that they connected "through a third party familiar with both companies that had recommended to Zerez that Tarpon might be able to assist Zerez in reducing its carried debt." *Id.* at 916. Zerez denies the involvement of a third party and insists that Aswani placed a "cold call" to Murga. *Id.* at 1302.

for its outstanding debt, the parties were aware that the transaction would require a court order approving the fairness of the terms pursuant to section 3(a)(10) of the Securities Act of 1933.[5] Joint App'x at 915–16, 1296.

Aswani sent Murga a proposed term sheet outlining the key aspects of the deal (the "Term Sheet"). *Id.* at 916, 1296. Under the Term Sheet, Tarpon Bay would individually engage and execute agreements with Zerez's creditors to buy the debt; Tarpon Bay would seek court approval of the section 3(a)(10) transaction within five days

---

[5] Section 3(a)(10) of the Securities Act exempts issuers from registration for securities issued in exchange for outstanding securities or other qualifying value. Specifically, the provision exempts from registration:

> [A]ny security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval . . . .

15 U.S.C. § 77c(a)(10).

of executing the agreements with Zerez's creditors; and Zerez would issue a commensurate amount of stock to Tarpon Bay, subject to certain limitations not relevant here. *Id.* at 981–82. The Term Sheet also specified that Tarpon Bay would receive (1) a $25,000 fee payable in cash or a promissory note for stock at Tarpon Bay's election ("Signing Fee") and (2) a fee worth $75,000 at minimum upon judicial approval of the transaction. *Id.* at 983. But the signature page of the Term Sheet indicated that the Term Sheet "merely represent[s] proposed terms for possible liabilities satisfaction. Until definitive documentation is executed by all parties, there shall not exist any binding obligation," other than two provisions relating to confidentiality and exclusivity. *Id.* at 984. Murga was personally involved in the discussions with Aswani, but Zerez alleges that it played no role in drafting the Term Sheet. *Id.* at 917, 1297, 1303. Zerez signed the Term Sheet on January 15, 2016. *Id.* at 984.

On January 27, 2016, Zerez executed a convertible promissory

note to Tarpon Bay for the Signing Fee ("Signing Fee Note"). *Id.* at 1005, 1012. The Signing Fee Note was issued pursuant to the Signing Fee provision in the Term Sheet. *Id.* at 917–18, 1296–98. Crucially, the Signing Fee Note was payable on demand and allowed Tarpon Bay "to convert all . . . of the Outstanding Principal Amount . . . into Common Stock at a conversion price . . . for each share of Common Stock at a 50% discount from the lowest closing bid price in the 30 trading days prior to the day that [Tarpon Bay] requests conversion." *Id.* at 1005–06. The Signing Fee Note also obligated Zerez "to reserve at least Five hundred million (500,000,000) shares of its Common Stock for issuance to Holder in connection with conversion of this Note." *Id.* at 1011. Aswani told Murga that Zerez was issuing the Signing Fee Note solely for the services that Southridge and Tarpon Bay would provide as part of the section 3(a)(10) transaction, and that Murga would need to execute the Signing Fee Note to proceed because it was a prerequisite to entering into a definitive agreement.

*Id.* at 918, 1304. Zerez alleges that it played no role in drafting the Signing Fee Note and that it felt that it had no meaningful choice in negotiating its terms given its financial condition. *Id.* at 1304. One day after Zerez executed the Signing Fee Note, Hicks signed the Term Sheet on January 28, 2016. *Id.* at 984. Murga alleges that he was unaware of Hicks's involvement prior to that point. Because Hicks had been the subject of unrelated lawsuits filed by federal and state securities regulators, Murga further alleges that Zerez would not have agreed to move forward with Tarpon Bay and Southridge had it known that Hicks was involved. *Id.* at 1151–52.

Between February and April 2016, Tarpon Bay proceeded to reach out to Zerez's creditors and ultimately executed agreements, termed "Claim Purchase Agreements," with eight creditors to purchase a total of $512,874.06 of Zerez's debt. *Id.* at 428, 919. Zerez has not disputed that it was aware of this process; two of Zerez's largest creditors, whom Tarpon Bay had engaged with Claim

11

Purchase Agreements, were Murga himself and Claudia Lima (Zerez's Secretary and Treasurer). *Id.* at 428, 919, 1000. On June 13, 2016—more than five days after the last Claim Purchase Agreement was executed, which was the time period expressly required by the Term Sheet[6]—Tarpon Bay filed an action against Zerez in Florida state court seeking a fairness hearing to approve the securities transaction pursuant to section 3(a)(10) of the Securities Act. *See Tarpon Bay Partners, LLC v. Zerez Holdings*, No. 2016-CA-001300 (Fla. Cir. Ct. filed June 13, 2016); *see also* Joint App'x at 920–21, 1299.

But the section 3(a)(10) transaction was never approved. Zerez did not appear at the hearing, and the parties dispute why.[7] *Id.* at 921,

---

[6] Moreover, the Claim Purchase Agreements required that Tarpon Bay file the section 3(a)(10) lawsuit within ten business days of execution. *See, e.g., id.* at 1016. The latest Claim Purchase Agreement was executed on April 26, 2016. *Id.* at 1063. While the Claim Purchase Agreements were binding on Tarpon Bay, Zerez was not a party to those agreements, and the agreements made clear that there were no third-party beneficiaries. *See, e.g., id.* at 1020.

[7] Tarpon Bay asserts that Murga confirmed via email that Zerez had obtained counsel to accept service of the section 3(a)(10) complaint but that Tarpon Bay never received the contact information of that attorney. Joint App'x at 921. Zerez counters that it was never told to retain counsel or pay the attorney's fee in

12

1299. On September 22, 2016, Murga emailed Aswani stating that Zerez wished to "stop and cancel the [3(a)(10)] filing" and to "pull back on the filing." *Id.* at 1067. The next day, Tarpon Bay was informed that three creditors were exercising their undisputed rights to cancel the Claim Purchase Agreements.[8] *Id.* at 1178–79. On October 10, 2016, Zerez sent a letter to Tarpon Bay on official letterhead informing Tarpon Bay that Zerez "HEREBY rescinds and cancels any and all consulting and/or services relationships with Southridge and/or Tarpon Bay . . . , and further HEREBY rescinds and cancels the $25,000" Signing Fee Note, citing the lack of "sufficient, adequate, []or material services" rendered to Zerez. *Id.* at 1069. Tarpon Bay responded via letter on October 17, 2016, asserting that Zerez had "no grounds to rescind" the Signing Fee Note and

the Florida proceeding, and that it was never notified once litigation was filed. *Id.* at 1305, 1665. Zerez maintains that Murga followed up repeatedly with Tarpon Bay, and in a call from Murga to Aswani about the transaction's progress, Aswani stated that the transaction was imminent. *Id.* at 1665.

[8] The Claim Purchase Agreements allowed either party to terminate the agreement if the section 3(a)(10) transaction was not approved within ninety days of the date of execution. *See, e.g., id.* at 1017.

demanding "immediate payment of all principal and interest due under the Note." *Id.* at 1071–72 (emphasis removed). Zerez also changed control and management by the end of October 2016 after it had acquired a new principal subsidiary, Next Generation Farming Inc. *Id.* at 945.

On November 29, 2016, Tarpon Bay sent Zerez a "Notice of Conversion" that demanded 278,958,900 shares of Zerez stock worth nearly $2.23 million on the date of conversion. *Id.* at 1074–76. Tarpon Bay relied on the Signing Fee Note provision that allowed payment in stock, rather than in cash; the cash value at the time, with accrued interest and fees, was $27,895.89. *Id.* at 1005–06, 1075. Tarpon Bay took advantage of very low stock pricing in the thirty days before November 29, 2016—specifically, the stock price of $0.0002 on October 17, 2016—and demanded conversion at the 50 percent discounted price per share of $0.0001 pursuant to the Signing Fee Note's conversion formula. *Id.* at 1075. Hicks candidly stated in later

deposition testimony that Tarpon Bay timed the conversion to take advantage of a price dip: "[W]e wanted to get the lowest possible conversion price, receive the shares and sell them in the market at the highest possible price. If we waited too long with the stock moving up, we would lose the low prices." *Id.* at 1228. Tarpon Bay's request for 278,958,900 shares was approximately 55.6 percent of the 500,000,000 reserve shares that the Signing Fee Note had required Zerez to set aside for potential conversion. *See id.* at 1011. Zerez refused to issue the shares to Tarpon Bay, and this litigation ensued.

## B. Procedural History

In January 2017, Zerez sued Counterclaim Defendants in the U.S. District Court for the Eastern District of California for a "judgment enforcing its rescission of the Term Sheet and Note for failure of consideration" and damages for unjust enrichment and fraud. *See* Compl. at 7, *Zerez Holdings Corp. v. Tarpon Bay Partners LLC*, No. 2:17CV00029(TLN)(DB) (E.D. Cal. filed Jan. 6, 2017); Joint App'x at 157–65. Tarpon Bay separately sued Zerez in Connecticut Superior

15

Court in March 2017 seeking specific performance of the conversion pursuant to the Signing Fee Note and Term Sheet. *See* Compl. at 11–12, *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, No. DBD-CV17-6021890-S (Conn. Super. Ct. filed Mar. 3, 2017); Joint App'x at 38–39. Zerez successfully removed the Connecticut action to the U.S. District Court for the District of Connecticut in April 2017. Joint App'x at 20. The California case was transferred to the District of Connecticut in January 2018, *see Zerez Holdings Corp. v. Tarpon Bay Partners LLC*, No. 2:17CV00029(TLN)(DB), 2018 WL 402238 (E.D. Cal. Jan. 12, 2018), and the two cases were consolidated into the case from which this appeal was taken, Joint App'x at 10.

In June 2018, Tarpon Bay filed the Amended Complaint seeking (1) immediate delivery of the 278,958,900 shares, (2) declaratory judgment in its favor, and (3) damages in the amount of $25.9 million (together, the "Affirmative Claims"). *Id.* at 842–43. Zerez filed the

Answer in August 2018 and asserted twelve affirmative defenses[9] and eleven counterclaims against Counterclaim Defendants.[10] *Id.* at 865–66, 882–890. Notable to this appeal, Zerez's second affirmative defense alleged that the terms of the Signing Fee Note were "unconscionable and/or unenforceable." *Id.* at 865.

Tarpon Bay moved for summary judgment in January 2019 on the Affirmative Claims and Zerez's twelve affirmative defenses, and Counterclaim Defendants moved for summary judgment on all eleven of Zerez's counterclaims. *Id.* at 911. Zerez did not cross-move

---

[9] Zerez asserted the following affirmative defenses: (1) failure to state a claim; (2) unconscionability; (3) lack of consideration; (4) unclean hands; (5) estoppel; (6) failure to satisfy the conditions precedent of the Signing Fee Note; (7) waiver; (8) laches; (9) rescission of the contract; (10) unjust enrichment; (11) voidness for misrepresentations made by Plaintiff; and (12) bad faith. *Id.* at 865–66.

[10] Zerez alleged the following counterclaims: (1) Breach of implied contract, against Tarpon Bay; (2) Declaratory relief, against Tarpon Bay; (3) Breach of fiduciary duty, against Southridge; (4) Usury, against Tarpon Bay; (5) Rescission for failure of consideration, against Tarpon Bay; (6) Fraudulent inducement, against Counterclaim Defendants; (7) Mistake, against Counterclaim Defendants; (8) Aiding and abetting, against Counterclaim Defendants; (9) Civil conspiracy, against Counterclaim Defendants; (10) Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17210, against Counterclaim Defendants; and (11) Violation of CUTPA, Conn. Gen. Stat. §§ 42-110a to -110q, against Counterclaim Defendants. Joint App'x at 882–90.

17

for summary judgment and argued only that Tarpon Bay's motion for summary judgment should be denied; regarding the Affirmative Claims, Zerez argued that its affirmative defenses precluded summary judgment in favor of Tarpon Bay. *Id.* at 1120. On unconscionability, Zerez submitted that, "[a]t a minimum, issues of fact remain as to whether the Note was unconscionable including a determination of whether the circumstances give rise to terms that are so one-sided as to be unconscionable." *Id.* at 1123. The motions for summary judgment were resolved in two decisions: one in September 2019 on the Affirmative Claims and unconscionability, *Tarpon Bay Partners LLC v. Zerez Holdings Corp.* (*Tarpon Bay I*), No. 3:17CV00579(SRU), 2019 WL 4646061 (D. Conn. Sept. 24, 2019), and another in July 2021 on all eleven of Zerez's counterclaims, *Tarpon Bay Partners LLC v. Zerez Holdings Corp.* (*Tarpon Bay II*), 547 F. Supp. 3d 195 (D. Conn. 2021).

In the first summary judgment decision, dated September 24,

2019, the district court denied summary judgment for Tarpon Bay on the Affirmative Claims. First, there remained "a question of material fact with respect to whether the" Signing Fee Note "was supported by adequate consideration." *Tarpon Bay I*, 2019 WL 4646061, at *7. Second, the Signing Fee Note was "unconscionable and, therefore, unenforceable." *Id.* at *8. The district court held that the Signing Fee Note was procedurally unconscionable because "[t]he undisputed facts of the case show that Tarpon Bay very clearly exploited its superior bargaining power over Zerez, which was on the verge of financial collapse, in order to control the terms of the agreement, and resultant partnership, and deprive Zerez of any meaningful choice in the agreement." *Id.* at *10. It also concluded that the Signing Fee Note was substantively unconscionable because the "terms . . . are extremely one-sided in Tarpon Bay's favor" and it would be entitled

to $25 million[11] "for little to nothing in return." *Tarpon Bay I*, 2019 WL 4646061, at *10.  But despite holding that the Signing Fee Note was unenforceable, the district court denied Tarpon Bay's motion for summary judgment without expressly indicating that the Affirmative Claims were dismissed as a matter of law or entering partial judgment for any party.  The district court also denied without prejudice Counterclaim Defendants' summary judgment motion on Zerez's counterclaims because Zerez had indicated that it would likely abandon those counterclaims if the Signing Fee Note were deemed unconscionable.  *Id.* at *11.

Shortly after the decision, Tarpon Bay moved to certify the

---

[11] The September 2019 decision initially stated that Tarpon Bay would be "entitled to $25 million for little to nothing in return. . . . It cannot be that Tarpon Bay receives [a] $25 million windfall with no promise in return or, at most, a promise to attempt to retire Zerez's debt." *Tarpon Bay I*, 2019 WL 4646061, at *10. But the July 2021 decision acknowledged that the $25 million sum represents the damages that Tarpon Bay sought, not the value of the stock requested under the Signing Fee Note.  The latter was valued at $2.23 million at the time of conversion. While it is unclear how Tarpon Bay calculated the $25 million sum for damages, we agree with the district court's July 2021 decision that the appropriate number to consider is $2.23 million, not $25 million.  *Tarpon Bay II*, 547 F. Supp. 3d at 209 n.6.

September 2019 order for interlocutory appeal to this court pursuant to 28 U.S.C. § 1292(b).[12] Joint App'x at 13. The district court denied the motion to certify in October 2019, concluding that its ruling did "not involve a controlling question of law" but rather "the application of undisputed facts in this case to the well-settled Connecticut law of unconscionability." *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, No. 3:17CV00579(SRU), 2019 WL 10984250, at *2 (D. Conn. Oct. 29, 2019). Zerez decided to pursue its counterclaims notwithstanding the September 2019 decision, and Counterclaim Defendants renewed their motion for summary judgment on Zerez's counterclaims. Joint App'x at 1438. Zerez also moved for partial summary judgment on

---

[12] Section 1292(b) states in relevant part:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b).

two of its eleven counterclaims, both of which it pursues on appeal: Counterclaim Two, seeking declaratory judgment as to Zerez's obligations under the Signing Fee Note, and Counterclaim Eleven, alleging a violation of CUTPA. *Id.* at 1806–07.

In the second summary judgment decision, dated July 7, 2021, the district court granted in part and denied in part Counterclaim Defendants' and Zerez's motions for summary judgment. *Tarpon Bay II*, 547 F. Supp. 3d at 227. Notably, the court granted summary judgment for Zerez on Counterclaim Two and concluded that "[b]ecause the Signing Fee Note is unconscionable and unenforceable, Zerez has no rights or obligations under the Signing Fee Note." *Id.* at 217. The court also granted summary judgment for Counterclaim Defendants on the CUTPA claim for two reasons: the deceptive conduct alleged was duplicative of the unconscionability claim, and Zerez had not established that it suffered an ascertainable loss under the statute. *Id.* at 223–24. As to Zerez's other counterclaims, judgment

22

was either entered for Counterclaim Defendants, or the counterclaims were dismissed as moot. *Id.* at 210, 227. The district court entered judgment on the eleven counterclaims and closed the case, but it did not enter judgment on the Affirmative Claims. Judgment at 1–2, *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, No. 3:17CV00579(SRU) (D. Conn. July 8, 2021).

The relevant dispositions from the district court's September 2019 and July 2021 opinions are summarized in the following table:

| AFFIRMATIVE CLAIMS Decided in September 2019 | | | |
|---|---|---|---|
| No. | Claim Asserted by Tarpon Bay | Defendant | Disposition of Tarpon Bay's Mot. for Summ. J. |
| 1. | Delivery of 278,958,900 shares | Zerez | Denied |
| 2. | Declaratory relief | Zerez | Denied |
| 3. | Award of damages | Zerez | Denied |
| COUNTERCLAIMS ON APPEAL Decided in July 2021 | | | |
| No. | Counterclaim Asserted by Zerez | Defendant | Disposition of Countercl. Defs.' Mot. for Summ. J. | Disposition of Zerez's Partial Mot. for Summ. J. |

| | | | | |
|---|---|---|---|---|
| 2. | Declaratory relief | Tarpon Bay | Denied | Granted |
| 11. | Violation of CUTPA | Countercl. Defs. | Granted | Denied |

Tarpon Bay timely appealed from the Judgment, and Zerez timely cross-appealed. Joint App'x at 1970, 2006. The parties participated in the Second Circuit's mediation program, but the case was ultimately reinstated on March 24, 2022.

## II.    Jurisdiction and Standard Of Review

Before turning to the merits of the dispute, we first address an issue that affects our jurisdiction. We have jurisdiction over "appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. "Finality is determined on the basis of pragmatic, not needlessly rigid *pro forma*, analysis. . . . What essentially is required is some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as it is concerned, is the end of the case." *Fiataruolo v. United States*, 8 F.3d 930, 937 (2d Cir. 1993). Although the parties do not challenge jurisdiction in this case, *see*

24

Appellants' Br. at 1; Cross-Appellant's Br. at 2, "we are obliged to raise the issue of our jurisdiction *nostra sponte* when it is questionable." *Massaro v. Palladino*, 19 F.4th 197, 208 (2d Cir. 2021) (internal quotation marks and citation omitted).

The district court denied summary judgment for Tarpon Bay in its September 2019 order "with respect to [Tarpon Bay's] three claims against Zerez because the purported agreement is unconscionable as a matter of law," *Tarpon Bay I*, 2019 WL 4646061, at *12, but did not enter judgment on those three claims—the Affirmative Claims—in *favor of* any party. *See* Judgment at 1–2. Denials of summary judgment are "by their terms interlocutory" and ordinarily not reviewable absent a final judgment disposing of the claims. *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011) (internal quotation marks and citation omitted). A denial of summary judgment for one party on the claims it has raised, without an accompanying grant of summary judgment for the opposing party on the same claims, would ordinarily mean

that the status quo is preserved and the claims proceed to trial. But we have clear indication here that the district court meant otherwise. The subsequent July 2021 order—which entered summary judgment only on Zerez's counterclaims, not Tarpon Bay's Affirmative Claims—stated that "[a]s a result of [the court's] rulings, no claims remain[ed] live in this action."[13] *Tarpon Bay II*, 547 F. Supp. 3d at 211.

We therefore interpret the district court's September 2019 order denying summary judgment for Tarpon Bay to also include a *grant* of summary judgment for Zerez on the Affirmative Claims. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[13] Moreover, in the October 2019 decision denying Tarpon Bay's motion for certification to the Second Circuit, the district court suggested that the unconscionability ruling was dispositive of all three of Plaintiff's breach of contract claims. *See Tarpon Bay*, 2019 WL 10984250, at *2 & n.1 (noting also that the September 2019 "Ruling is not dispositive of the case as a whole" because "Zerez's eleven counterclaims [were] still pending"). But as mentioned earlier, the district court nonetheless refrained from characterizing its September 2019 decision as a ruling on "a controlling question of law" but rather viewed it as an "application of undisputed facts . . . to the well-settled Connecticut law of unconscionability." *Id*. at *2.

as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one that would 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs 'if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.'" *Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66, 72 (2d Cir. 2022) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). By ultimately holding that the Signing Fee Note was "unconscionable as a matter of law," *Tarpon Bay I*, 2019 WL 4646061, at *12, the September 2019 decision necessarily concluded that any genuine issue of fact regarding consideration was not material.[14] *See Anderson*, 477 U.S. at 248 ("Factual disputes that

---

[14] The district court reached two conclusions in the September 2019 opinion: first, that "there is a question of *material* fact with respect to whether the Promissory Note was supported by adequate consideration," and second, that "the Promissory Note was . . . unconscionable and, therefore, unenforceable." *Tarpon Bay I*, 2019 WL 4646061, at *8 (emphasis added).

But the second holding would have to render the "question of . . . fact with respect to whether the Promissory Note was supported by adequate consideration" *not* material. *Id.* As discussed below, *infra* pp. 34–35, unconscionability is a defense to contract enforcement under Connecticut law. So even if Tarpon Bay had shown that there was no genuine issue of fact that

27

are irrelevant or unnecessary will not be counted."). Put simply, the district court reasoned—without formally stating it—that summary judgment for Zerez on the Affirmative Claims was proper. Later, in July 2021, the district court entered judgment on Zerez's counterclaims, which were the only live claims that remained in the case. *See* Judgment at 1–2. After that point, "there was nothing left for the district court to decide that would have affected the respective positions of the parties." *Massaro*, 19 F.4th at 208–09. The July 2021 Judgment was therefore "final" under 28 U.S.C. § 1291. And because the September 2019 summary judgment order merges into the July 2021 final judgment on appeal, we have jurisdiction to review both decisions. *See Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 144 (2d Cir. 2013) (merging earlier summary judgment decisions into the judgment

---

consideration supported the Signing Fee Note, the district court's legal determination that the contract was unconscionable would have still meant that the contract is unenforceable. Facts relating to consideration should have, therefore, been deemed not material for summary judgment purposes. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

upon timely appeal).

Tarpon Bay also asks us to review the district court's denial of its motion for summary judgment on the Affirmative Claims. The denial of a motion for summary judgment is usually not immediately appealable. *See id.* at 144 n.4; *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 133 (2d Cir. 2013) (applying the collateral order doctrine, which renders some summary judgment denials immediately appealable, in a qualified immunity case). But the more precise jurisdictional question here is not whether the denial is immediately appealable, but whether the denial becomes reviewable upon appeal from final judgment. In cases where appeal is taken from final judgment, we have the discretion to review a denial of summary judgment that accompanies a grant of summary judgment on cross-motion. *See Barhold v. Rodriguez*, 863 F.2d 233, 237 (2d Cir. 1988) ("[A]s we have jurisdiction to decide [the appellants'] appeal from the granting of [the appellees'] motion for summary judgment, we

exercise our discretion to decide [the appellants'] claim of error in the denial of their summary judgment motion as well."); *see also Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 320 (2d Cir. 2013) ("Because we have jurisdiction over the grant of summary judgment, we have the discretion to review the otherwise unappealable order denying [the appellants'] cross-motion for summary judgment." (citing *Barhold*, 863 F.2d at 237)); *see also Am. Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293, 302 (2d Cir. 1989) (citing *Barhold*, 863 F.2d at 237) (similar).[15]

Because we interpret the September 2019 order denying

---

[15] *Gold* does not compel a different result here. In that case, the court "decline[d] to review the district court's decision" and explained that "[w]here a district court has denied summary judgment because resolution of such claim requires the adjudication of issues of fact that are inseparable from the merits, the denial of such motion is not immediately appealable notwithstanding the merger doctrine." *Gold,* 730 F.3d at 144 n.4. But the denial of summary judgment in *Gold* was not on cross-motion to the grant of summary judgment that the court reviewed; the motions underlying the grant and denial requested summary judgment on independent causes of action at different stages in the litigation before the district court. *See id.* at 140–41.

By contrast, *Barhold*'s line of cases establishes that we may review denials of summary judgment that accompany grants on cross-motion. And each of those cases reviewed denials of summary judgment for questions of fact or mixed

summary judgment for Tarpon Bay on the Affirmative Claims to also grant summary judgment for Zerez, the district court's denial and corresponding sua sponte grant disposed of the Affirmative Claims on what effectively were cross-motions for summary judgment. *Cf. Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) ("[I]t is most desirable that the court cut through mere outworn procedural niceties and make the same decision as would have been made had [the nonmoving party] made a cross-motion for summary judgment." (quoting *Local 33, Int'l Hod Carriers Bldg. & Common Laborers' Union of Am. v. Mason Tenders Dist. Council of Greater N.Y.*, 291 F.2d 496, 505 (2d Cir. 1961))). Just as the merger doctrine extends our review from the final disposition in July 2021 to the earlier grant of summary judgment for Zerez in September 2019, *see Gold*, 730 F.3d at 144, it also extends our appellate jurisdiction to the corresponding denial of summary judgment for Tarpon Bay, *see Marvel Characters*,

questions of law and fact. *See Marvel*, 716 F.3d at 320; *Am. Motorists*, 876 F.2d at 303; *Barhold*, 863 F.2d at 237.

31

716 F.3d at 320. For reasons of judicial economy, we exercise our discretion to review the denial here.

We review the district court's summary dispositions *de novo*. *See id.* For summary judgment to be warranted, the evidence, construed in the light most favorable to the party against whom it was entered, must show that there is no genuine issue of material fact, and the moving party must be entitled to judgment as a matter of law. *See Aetna Life Ins.*, 52 F.4th at 72; Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute" is insufficient to reverse a grant of summary judgment. *Anderson*, 477 U.S. at 247–48.

## III. Discussion

The parties present three questions on appeal. First, Tarpon Bay challenges the district court's ruling that the Signing Fee Note was unconscionable. Second, Tarpon Bay argues that the district court erred in determining that there remained a genuine issue of material fact as to whether consideration supported the Signing Fee Note. And third, Zerez challenges on cross-appeal the district court's

grant of summary judgment for Tarpon Bay on Counterclaim Eleven, which alleged that Counterclaim Defendants violated CUTPA.

For the reasons discussed below, we first vacate the district court's ruling that the Signing Fee Note was unconscionable as a matter of law, on the record before it at summary judgment. We then conclude that the district court correctly determined that genuine issues of material fact remained as to whether consideration supported the Signing Fee Note. The district court's dismissal of the Affirmative Claims is therefore also vacated, and the denial of summary judgment for Tarpon Bay is affirmed.[16] Finally, we affirm the district court's grant of summary judgment on Zerez's CUTPA counterclaim on the alternative ground that CUTPA does not apply

---

[16] The district court also dismissed as moot Counterclaims Five (Rescission), Six (Fraud), Seven (Mistake), Nine (Civil Conspiracy), and parts of Counterclaim Two (Declaratory Relief) because the relief sought by those counterclaims was duplicative of its September 2019 holding that the Signing Fee Note was unenforceable. *Tarpon Bay II*, 547 F. Supp. 3d at 216–18, 220. Zerez has not pursued those claims on appeal.

to the case at bar.

## A.    Unconscionability

The Signing Fee Note makes clear that Connecticut law governs the dispute.  Joint App'x at 1008.  Under Connecticut law, the doctrine of unconscionability is a defense to contract enforcement that is intended "to prevent oppression and unfair surprise."[17]  *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 87–88 (1992) (internal quotation marks and citation omitted).  "The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other."  *Bender v. Bender*, 292 Conn. 696, 731–32 (2009) (internal quotation marks and citation omitted).  The question of whether a contract is unconscionable "is a matter of law to be decided by the court based on all the facts and circumstances of

---

[17] In reviewing the district court's unconscionability ruling, we assume arguendo that there are genuine issues of material fact regarding whether the Signing Fee Note was part of a validly formed contract between Tarpon Bay and Zerez.  *See infra* section III.B.

the case." *Cheshire*, 223 Conn. at 87 (internal quotation marks and citation omitted).

Like those of many other jurisdictions, Connecticut courts have parsed the unconscionability inquiry into procedural and substantive prongs. *See* Restatement (Second) of Conts. § 208 (Am. L. Inst. 1981) (collecting cases by jurisdiction). A successful unconscionability defense "'generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Bender*, 292 Conn. at 732 (quoting *Hottle v. BDO Seidman, LLP*, 268 Conn. 694, 719 (2004)). [18] Procedural

---

[18] The district court cited *Bender* but nonetheless stated that "only substantive unconscionability is required." *Tarpon Bay I*, 2019 WL 4646061, at *9. When determining the applicable law as it would be applied by the state courts in diversity cases, federal courts must consult the forum state's constitution, statutes, and highest court. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 497 (2d Cir. 2020); *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994). We conclude that the district court's

holding ultimately does not follow the Connecticut Supreme Court's most recent authority on unconscionability.

Noting that the quotation in *Bender* derived from *Hottle v. BDO Seidman*, a Connecticut Supreme Court case interpreting New York law, *see* 268 Conn. at 719–20 (citing *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988)), the district court relied instead on an earlier case applying Connecticut law. *See Smith v. Mitsubishi Motors Credit of Am., Inc.*, 247 Conn. 342, 353 (1998) ("Even in the absence of procedural unconscionability, [the defendant] might avoid liability . . . if he could establish that the clause was substantively unconscionable."); *Tarpon Bay I*, 2019 WL 4646061, at *9. But notwithstanding its New York origins, the *Bender* rule is controlling here. *Bender* interpreted Connecticut contract law, *see* 292 Conn. at 730–31 (collecting Connecticut cases on unilateral mistake), and applied the *Hottle* quotation as part of Connecticut contract law, *see id.* at 732–34 & n.26 (following its recitation of the *Hottle* quotation with an evaluation of *both* procedural and substantive unconscionability). What was once a statement of New York law is now adopted into Connecticut law. The *Bender* Court's general requirement that both unconscionability prongs be established is, therefore, "state law as announced by the highest court of the State," and we are compelled to apply it. *Comm'r v. Bosch's Est.*, 387 U.S. 456, 465 (1967).

*Smith* may still supply an exception to the general rule in *Bender*. The *Bender* court only "*generally* require[d]" both unconscionability prongs and, in its statement of the rule on unconscionability, approvingly quoted another portion of *Smith*; the court did not appear to view the two cases in tension. *See* 292 Conn. at 731–32 (emphasis added). The Connecticut Supreme Court has never overruled or otherwise cast doubt on its unconscionability analysis in *Smith*. Moreover, the *Hottle* case—from which *Bender* derived its standard—held that under New York law, a contract may be rendered "unenforceable solely on the ground of substantive unconscionability." *Hottle*, 268 Conn. at 720–21 (citing *Gillman*, 73 N.Y.2d at 12).

But acknowledging that *Smith* may provide an exception to *Bender*'s general rule is not to say that only substantive unconscionability is required. Equating the two elides a question of degree. Proving oppressive terms under two-pronged unconscionability is already a difficult task, but prevailing on substantive unconscionability alone would require an even more onerous showing of oppression. *Cf. Hottle*, 268 Conn. at 721 ("[P]rocedural and substantive unconscionability operate on a 'sliding scale'; the more questionable the

36

unconscionability relates to the "process by which the allegedly offensive terms found their way into the agreement." *Cheshire*, 223 Conn. at 87 n.14 (internal quotation marks and citation omitted). It applies when there was "an absence of meaningful choice" by one of the parties. *Bender*, 292 Conn. at 732 (internal quotation marks omitted). Substantive unconscionability, by contrast, relates to "the content of the contract," *Cheshire*, 223 Conn. at 87 n.14 (internal quotation marks and citation omitted), and applies when contract terms are "unreasonably favorable" to one party, *Bender*, 292 Conn. at

meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." (quoting *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (App. Div. 1983))). To date, no Connecticut appellate court has determined how extreme the facts may be to justify application of the *Smith* exception. And recent cases have all cited the *Bender*, not *Smith*, rule on unconscionability. *See Hirsch v. Woermer*, 184 Conn. App. 583, 589 (2018); *Emeritus Senior Living v. Lepore*, 183 Conn. App. 23, 29 (2018); *Bank of Am., N.A., v. Aubut*, 167 Conn. App. 347, 379–380 (2016); *R.F. Daddario & Sons, Inc. v. Shelansky*, 123 Conn. App. 725, 741 (2010). *But see Velasco v. Comm'r of Corr.*, 214 Conn. App. 831, 841–42 (questioning but ultimately declining to clarify the status of *Smith* after *Bender*), *cert. denied*, 345 Conn. 960 (2022); *Shoreline Commc'ns, Inc. v. Norwich Taxi, LLC*, 70 Conn. App. 60, 70–71 (2002) (stating that the court "know[s] of no case, and the defendant has cited none, in which a party may invoke unconscionability without a showing of some kind of relevant misconduct by the party seeking enforcement of a contract," but then evaluating whether substantive unconscionability existed). The *Smith* exception ultimately falls far short of swallowing the *Bender* rule.

732 (internal quotation marks omitted). In short, the doctrine of procedural unconscionability is "intended to prevent unfair surprise," and the doctrine of substantive unconscionability is "intended to prevent oppression." *Smith*, 247 Conn. at 349.

Prevailing on unconscionability is generally difficult, and for good reason. It asks the court to step in and undo the allocation of risk in a contract. While courts have the power "to police explicitly against the contracts or clauses which they find to be unconscionable," the principle underpinning unconscionability "is one of the prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power." U.C.C. § 2-302 cmt. 1 (Am. L. Inst. & Unif. L. Comm'n 1977) (citation omitted).[19]

Unconscionability has its origins in Roman law doctrines of

---

[19] Connecticut has adopted verbatim section 2-302 of the Uniform Commercial Code ("UCC"), which reads in relevant part:

"just price" and in English courts of equity; it serves as a flexible last

resort when other contract law doctrines are unable to redress the

injustice at issue. *See* Robert E. Scott & Jody S. Kraus, *Contract Law*

*and Theory* 501, 507–08 (2013); U.C.C. § 2-302 cmt. 1. Procedural

unconscionability fills in the gaps left by other doctrines intended to

regulate the bargaining process, such as incapacity, fraud, and duress.

Substantive unconscionability is similar to, but more pliable than, the

invalidation of contract on public policy grounds. But an overly

expansive unconscionability doctrine would undermine the

countervailing principles that "courts do not unmake bargains

> If the court as a matter of law finds the contract or any clause of the
> contract to have been unconscionable at the time it was made the
> court may refuse to enforce the contract, or it may enforce the
> remainder of the contract without the unconscionable clause, or it
> may so limit the application of any unconscionable clause as to
> avoid any unconscionable result.

Conn. Gen. Stat. § 42a-2-302(1). Although article 2 of the UCC applies only to
"transactions in goods" and does not strictly apply here, *id.* § 42a-2-102,
Connecticut courts have looked to the UCC as "a useful guide in examining a claim
of unconscionability." *Texaco, Inc. v. Golart*, 206 Conn. 454, 461–62 (1988); *see also,*
*e.g.*, *Cheshire*, 223 Conn. at 88–89; *Hamm v. Taylor*, 180 Conn. 491, 495 (1980).

unwisely made," and that parties have the autonomy to bargain and allocate risks as they please. *Osborne v. Locke Steel Chain Co.*, 153 Conn. 527, 533 (1966); *see also Kent Literary Club of Wesleyan Univ. v. Wesleyan Univ.*, 338 Conn. 189, 241 (2021) ("It is axiomatic that courts do not rewrite contracts for the parties." (internal quotation marks and citation omitted)). In short, "'unconscionability' cannot be equated with 'harshness' as an abstract matter." Arthur Allen Leff, *Unconscionability and the Code—the Emperor's New Clause*, 115 U. Pa. L. Rev. 485, 540 (1967).

Moreover, an unconscionability claim is typically reserved for vulnerable consumers seeking to prevent enforcement of exploitative terms by relatively more sophisticated businesses. *See Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.*, 31 Conn. App. 455, 465 (1993) ("Although [certain] provisions might be unconscionable in an ordinary consumer lease, a different conclusion may follow where, as here, the contract is a commercial finance lease executed by two

corporate entities."); *Iamartino v. Avallone*, 2 Conn. App. 119, 126 (1984) ("The loan was a commercial, not a consumer, transaction."); *cf. Cheshire*, 223 Conn. at 124–25 (Berdon, J., dissenting in part and concurring in part) (stating that the majority reviewed the case "through the lens of commercially savvy parties" instead of "between a professional mortgage lender and unsophisticated credit consumers who had a total monthly income below the poverty level"). Indeed, "[c]ourts do not generally find contracts unconscionable where the parties are businesspersons." *Stamford Hosp. v. Schwartz*, 190 Conn. App. 63, 76 (2019) (quoting *Emlee*, 31 Conn. App. at 464); *see also* 1 James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code* § 5:3 (6th ed. 2020) ("The modal successful unconscionability claimant is a consumer of small means who has purchased a television or the like for a price that well exceeds the price available at stores where the middle class shop."). Where commercial parties engage in arm's-length negotiations and are sufficiently

41

sophisticated to understand the agreements they execute, raising the unconscionability defense asks the court to reconstruct economic outcomes. We decline to do so in this case.

First, the Signing Fee Note is not procedurally unconscionable. Both Zerez and Tarpon Bay are sophisticated commercial parties: Zerez is publicly traded, and both parties routinely invest in other companies. Murga, Zerez's then-CEO, was personally involved in the discussions with Aswani and had the opportunity to review the terms before signing. While Zerez alleges that Murga played no role in drafting the Signing Fee Note, there is no indication that Murga ever asked to edit any of the Signing Fee Note's provisions. *See* Joint App'x at 917, 1297, 1303; *see also Smith*, 247 Conn. at 351–52 ("We have never held that principles of unconscionability supersede, in toto, the duty of a contracting party to read the terms of an agreement or else be deemed to have notice of the terms."). Moreover, Zerez had counsel on retainer at the time of the Signing Fee Note's execution. In an

42

invoice for services rendered from October 2015 to February 2016—

which overlapped with the execution of the Term Sheet and Signing

Fee Note in January 2016—attorney Mark H. Cheung billed $30,000

to Zerez for legal work on "promissory notes" and "review of

contractual matters." Joint App'x at 1259. The record at this stage

does not reveal whether Cheung reviewed or otherwise had a role in

negotiating the Term Sheet and Signing Fee Note in January 2016.[20]

But even if Cheung did not review the contracts for Zerez, Zerez

cannot now claim hardship where it was *able* to solicit legal advice on

the Signing Fee Note if it felt coerced or did not understand the terms'

implications. *See Cheshire*, 223 Conn. at 90–91 (finding that an

attorney's explanation to the defendants of a loan's terms supported

the trial court's finding that the loan was not procedurally

---

[20] Cheung must have been aware of the section 3(a)(10) transaction by April 2016 because his law office was also a creditor of Zerez whom Tarpon Bay had engaged with a Claim Purchase Agreement; moreover, Cheung was the person who, in September 2016, emailed Aswani that he, along with two other creditors, were cancelling their Claim Purchase Agreements once the deal had broken down. *See id.* at 1178, 1245–46, 1248.

unconscionable). Zerez's failure to consult with readily available counsel, in these circumstances, precludes a finding of procedural unconscionability.

Zerez also argues that the Signing Fee Note was procedurally unconscionable because its business desperately needed to retire its debt, and the company was "susceptible to coercion" because "it was presented with only one choice to address its debt." Cross-Appellant's Br. at 29. Zerez maintains that because Aswani told Murga that "signing of the Note was a prerequisite to entering in[to] a definitive agreement," Murga understood that he "had no meaningful choice in negotiating its terms given Zerez's financial condition." *Id.* at 30 (citations to record omitted). But Zerez could have walked away or engaged other parties if it did not like Aswani's terms. Zerez received cold calls from multiple entities yet nonetheless chose to proceed with Tarpon Bay. Joint App'x at 871. Murga himself suggested that Zerez had options. He stated in a sworn declaration

44

that "Zerez would not have agreed to move forward with Southridge or Tarpon" if it knew that Hicks, facing unrelated allegations of securities fraud, was involved in the transaction. *Id.* at 1151–52. And after the transaction with Tarpon Bay had failed, Zerez was able to merge in a newly acquired subsidiary, which involved the issuance of two billion new shares and a change in company management. *See id.* at 967. Zerez may not have had many options, but it had more than one. *See Marcus Dairy, Inc. v. Rollin Dairy Corp.*, No. 3:05CV00589(PCD), 2008 WL 4425954, at *11 (D. Conn. Sept. 24, 2008) (finding no unconscionability where defendant received pricing information from several other suppliers before choosing plaintiff). Nor does Zerez argue that its financial distress—the $500,000 of debt on its books and resulting need for new capital—was somehow caused by Tarpon Bay's actions. *See Krishnamurti v. Tortorici*, No. FST-CV19-6042031-S, 2021 WL 2403325, at *7 (Conn. Super. Ct. May 21, 2021) ("Any financial pressure that the defendant was under was not

caused in any way by the plaintiff."). Even when construed in favor of Zerez, the circumstances surrounding execution of the Signing Fee Note do not rise to the level of unfair surprise, lack of knowledge of terms, lack of legal representation, and absence of meaningful choice that characterizes procedural unconscionability.

Nor are the terms of the Signing Fee Note substantively unconscionable. Zerez argues that the Signing Fee Note is oppressive, even if redemption were limited to $25,000 in cash, because it was redeemed "for nothing" in return. Cross-Appellant's Br. at 24. That argument fails as a matter of law. "The general rule is that, in the absence of fraud or other unconscionable circumstances, a contract will not be rendered unenforceable at the behest of one of the contracting parties merely because of an inadequacy of consideration." *Rockstone Cap., LLC v. Caldwell*, 206 Conn. App. 801, 815 (2021) (quoting, ultimately, *Osborne*, 153 Conn. at 533) (reversing trial court's holding that agreement was substantively

46

unconscionable because defendant received "no direct consideration"), *cert. denied*, 339 Conn. 914 (2021) . To hold otherwise misappropriates the unconscionability doctrine, meant for vulnerable contracting parties, for what is substantively a challenge to the adequacy of consideration.

Zerez further contends that the Signing Fee Note is "even more" unconscionable "under the Note's conversion provision" that resulted in the claim of 278,958,900 shares, worth $2.23 million. Cross-Appellant's Br. at 24. In other words, Zerez challenges the *method* of payment of the Signing Fee—the conversion provision—rather than the fact that Zerez had to render payment at all ($25,000 or 278,958,900 shares). This argument, too, fails.

The Signing Fee Note allowed for two payment methods: (1) payment of a fixed $25,000 fee, in addition to accrued interest and other fees, or (2) payment of the same value in stock using a predetermined cash-to-stock conversion ratio, which was a "50%

discount from the lowest closing bid price in the 30 trading days prior" to the conversion notice. Joint App'x at 1006. Zerez, short on cash, might have benefitted from paying out a Signing Fee in stock. But penny stocks "are considered to be particularly high risk and not suitable to all investors," *SEC v. Bronson*, 14 F. Supp. 3d 402, 404 n.1 (S.D.N.Y. 2014); *see also supra* note 2, so in choosing an alternative payment method, Zerez agreed to a risky bet. Specifically, Zerez wagered that its stock price would remain low enough that Tarpon Bay would prefer stock to cash, yet stable enough that Zerez could issue the shares quickly before prices appreciated. By contrast, Tarpon Bay wagered that the stock price would also remain low enough to prefer stock to cash, but sufficiently volatile that Tarpon Bay could opportunistically convert shares after a drastic price dip. The parties could have agreed to a straightforward payment of cash but instead executed—assuming consideration arguendo—the Signing Fee Note, which introduced market risk in determining the

48

payment method. And a bet on the public markets between commercial parties, without more, does not constitute a "contract term[] which [is] unreasonably favorable" to the profiting party. *Bender*, 292 Conn. at 732 (quoting *Hottle*, 268 Conn. at 719).

Zerez's reliance on the conversion amount of $2.23 million to establish substantive unconscionability as a matter of law is also misplaced. The district court calculated the $2.23 million sum by multiplying the 278,958,900 shares that Tarpon Bay requested by $0.008, Zerez's stock price on November 28, 2016, one day before the Notice of Conversion. *See Tarpon Bay II*, 547 F. Supp. 3d at 208; *supra* note 11. But unconscionability is evaluated at the time of the contract's formation, not at any time thereafter when the oppression allegedly took place. *See Cheshire*, 223 Conn. at 89. At the time of the contract's formation, the Signing Fee Note obligated Zerez "to reserve at least Five hundred million (500,000,000) shares of its Common Stock for issuance to [Tarpon Bay] in connection with conversion of

49

this Note." Joint App'x at 1011. The quantity of 278,958,900 shares—

constituting 55.6 percent of the total amount of reserved shares—

could not have been oppressive at the time of execution because Zerez

agreed to a provision that expressly contemplated a conversion of up

to 500,000,000 shares. And on at least ten occasions from December

2014 to January 2016, Zerez had issued common stock pursuant to

convertible promissory notes and compensation packages at

conversion prices ranging from $0.0001—the same as Tarpon Bay's

requested conversion price—to $0.003.[21] *See* Appellants' Br. at 22–23;

Joint App'x at 959. Where the allegedly problematic conversion was

contemplated by another provision in the Signing Fee Note and

executed at a price consistent with prior share issuances, we cannot

conclude that the Signing Fee Note payment method was oppressive

---

[21] The record is silent as to how these conversion prices were determined, and it is likewise unclear whether Zerez has in the past agreed to a conversion formula comparable to the formula in this case.

to Zerez.

This case does not involve vulnerable consumers seeking relief from unfairly surprising and oppressive terms. Instead, we are asked to undo an investment deal that unevenly distributed risk among sophisticated parties. For a commercial party like Zerez, unconscionability demands much more. Yes, the Signing Fee Note may have been executed under confusing circumstances, and yes, it may have featured terms benefitting one side more than the other. But that does not compel us to conclude on the record as currently developed that the Signing Fee Note—if it was a valid contract—was either unfairly surprising or oppressive. We vacate the district court's September 2019 order dismissing Tarpon Bay's claims on the basis that the Signing Fee Note is unenforceable. For the same reasons, we also vacate the district court's grant of summary judgment on

Counterclaim Two.[22]

### B. Consideration

In the same September 2019 order, the district court denied Tarpon Bay's motion for summary judgment on the Affirmative Claims because "there is a question of material fact with respect to whether the [Signing Fee Note] was supported by adequate consideration." *Tarpon Bay I*, 2019 WL 4646061, at *7. We affirm that ruling. The factual issues regarding consideration may reasonably be resolved in favor of either party, and consideration is material to whether Tarpon Bay may prevail on its Affirmative Claims. The Affirmative Claims are accordingly remanded for trial.

"Under the law of contract, a promise is generally not

---

[22] Counterclaim Two sought a declaration of Zerez's "rights and duties, if any, under the [Signing Fee] Note and any implied in fact contract and [a] declaration as to Tarpon's obligations to provide any performance." Joint App'x at 883. In July 2021, the district court granted summary judgment on Counterclaim Two because it had held in September 2019 that the Signing Fee Note was unconscionable and unenforceable. *Tarpon Bay II*, 547 F. Supp. 3d at 217. Because we here vacate the underlying unconscionability holding, we also vacate the grant of summary judgment on Counterclaim Two.

enforceable unless it is supported by consideration." *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 104 (2003) (internal quotation marks and citation omitted). Consideration "consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Viera v. Cohen*, 283 Conn. 412, 440–41 (2007) (internal quotation marks and citation omitted). A return promise for performance is sufficient consideration, so long as the party making the return promise does not have a preexisting duty to honor that return promise. *See, e.g.*, *Bilbao v. Goodwin*, 217 A.3d 977, 988 (Conn. 2019); *Christophersen v. Blount*, 216 Conn. 509, 511 n.3 (1990); *see also* Conn. Gen. Stat. § 42a-3-303(a) ("An instrument is issued or transferred for value if . . . [t]he instrument is issued or transferred for a promise of performance, to the extent the promise has been performed . . . ."). It is longstanding precedent in Connecticut that "[i]n the case of . . . promissory notes, the expression *for value received*[] raises a presumption of . . . legal consideration."

*Alcantara v. Pimentel*, No. UWY-CV13-6020129-S, 2017 WL 4621386, at

*2 (Conn. Super. Ct. Aug. 21, 2017) (quoting *Raymond v. Sellick*, 10

Conn. 480, 484 (1835)).  But a formal recitation of consideration, such

as "for value received," "is simply prima facie evidence, shifting the

burden of proof to the party disputing the consideration."  *TIE*

*Commc'ns, Inc. v. Kopp*, 218 Conn. 281, 292 (1991) (citing *Raymond*, 10

Conn. at 483).

> The Signing Fee Note reads in relevant part:
>
> FOR VALUE RECEIVED, the Company promises to pay
> Tarpon Bay Partners, LLC . . . the principal sum of
> Twenty Five Thousand Dollars and No Cents
> ($25,000.00) . . . or such lesser principal amount
> following the conversion or conversions of this Note in
> accordance with Paragraph 2 . . . payable on
> demand . . . .

Joint App'x at 1005.  Because this language "raises a presumption

of . . . legal consideration," *Alcantara*, 2017 WL 4621386, at *2 (quoting

*Raymond*, 10 Conn. at 484), the burden shifts to Zerez to establish a

genuine issue of material fact which, if taken as true, would rebut the

presumption.  *See Taft Realty Corp. v. Yorkhaven Enters., Inc.*, 146 Conn.

338, 342–43 (1959); *cf. Fieldpoint Priv. Sec. v. Fed. Ins. Co.*, No. FST-CV21-6049713-S, 2021 WL 5919792, at *5 (Conn. Super. Ct. Nov. 29, 2021) ("In connection with a hypothetical summary judgment motion, the court presumably would have before it a factual record, such that if the defendant were to present evidence affirmatively establishing (on a prima facie basis) that no consideration had been paid to the plaintiff by the Bermuda claimants, the burden would shift to the plaintiff to establish a material issue of fact as to payment of fees (or establish the non-materiality of the issue of payment)."). Tarpon Bay contends on appeal that Zerez failed to rebut the "for value received" presumption, and accordingly argues that summary judgment on the Affirmative Claims should enter in its favor. *See* Appellants' Br. at 39–40, 45; Appellants' Reply at 14–17.

We disagree. Zerez raises genuine issues of material fact that may, if resolved in its favor at trial, rebut the presumption of consideration. We discern from the parties' summary judgment

55

arguments that there are three possible ways a contract could have been formed:

1. The Term Sheet is an unenforceable agreement to agree. But the Signing Fee Note was executed by Zerez in exchange for a return promise by Tarpon Bay—made at some point after the Term Sheet was signed but before the Signing Fee Note was executed—to begin the section 3(a)(10) transaction pursuant to the Term Sheet's contemplated deal structure.

2. The Term Sheet is an unenforceable agreement to agree. But the Signing Fee Note was an offer by Zerez to induce Tarpon Bay to proceed with the section 3(a)(10) transaction. Tarpon Bay accepted that offer by commencing performance when it contacted creditors, executed Claim Purchase Agreements, and filed suit in Florida state court.

3. The Term Sheet itself is a binding agreement. It includes a return promise by Tarpon Bay to begin the debt-for-equity transaction pursuant to the Term Sheet's contemplated deal structure. The Signing Fee Note is effectively an addendum that specifies the Signing Fee provision of the Term Sheet in greater detail.

We analyze the three possibilities in turn and conclude that Zerez meets its burden of production on rebutting each.

The first option is precluded because Zerez submitted

56

deposition evidence that raised a genuine issue of material fact as to whether Tarpon Bay ever made a valid return promise to begin the section 3(a)(10) transaction. Hicks stated in his deposition testimony:

> Q. Did Tarpon Bay have any obligation to purchase the liabilities of Zerez at the time the note was executed?
>
> A. That certainly was the plan, and that's what happened.
>
> Q. Do you have an understanding of whether that obligation existed at the time the promissory note was executed?
>
> A. I believe—I'm not a lawyer, but I believe that it was a valid note regardless of whether or not Tarpon Bay ultimately performed work.

Joint App'x at 1203. If Tarpon Bay was entitled to the Signing Fee Note "regardless of whether or not Tarpon Bay ultimately performed work," then there was no return promise to perform made by Tarpon Bay. *Id.* The Signing Fee Note would then be an unenforceable executory promise. To be clear, there is record evidence suggesting that Tarpon Bay made a return promise. Aswani stated to Murga during the Signing Fee Note negotiations that Murga would need to

57

sign the Signing Fee Note in order to proceed because it was a prerequisite to entering into a definitive agreement. *Id.* at 1152. Tarpon Bay also signed the Term Sheet one day after Zerez executed the Signing Fee Note, which could reflect the existence of a return promise. And Tarpon Bay's subsequent performance—when it contacted creditors, executed eight Creditor Purchase Agreements, and initiated a lawsuit in Florida state court—may also be evidence of a return promise. But because the factual issue of whether there was a return promise may reasonably be resolved in favor of either party, summary judgment under option one is unwarranted.

The second option is precluded because the record does not clearly establish that the Signing Fee Note (separate and apart from the Term Sheet) was an offer that Tarpon Bay accepted by beginning performance. In its July 2021 decision, the district court evaluated Zerez's counterclaim for "breach of implied contract" and reasoned:

> Some implied contract likely existed between the parties. Without executing the definitive documentation that the

> Term Sheet called for, Tarpon Bay entered into Claim
> Purchase Agreements to acquire over $500,000 of Zerez's
> outstanding debt and filed the Florida Case. It is difficult
> to believe that Tarpon Bay would have undertaken those
> actions if it thought that Zerez had made no return
> promises.

*Tarpon Bay II*, 547 F. Supp. 3d at 212. Under this theory of implied contract, the Term Sheet was a nonbinding agreement to agree, and the Signing Fee Note was an offer by Zerez. Tarpon Bay then accepted Zerez's offer by return promise: not by verbally communicating a return promise, but by performance—namely contacting creditors, executing Claim Purchase Agreements, and filing the Florida lawsuit. *See* Restatement (Second) of Conts. § 50 cmt. b ("[T]he beginning of performance or a tender of part performance operates as a promise to render complete performance."). Zerez was aware of Tarpon Bay's actions—two of its corporate officers were creditors whom Tarpon Bay had engaged— yet never objected or attempted to revoke the Signing Fee Note. Under this implied contract theory, Zerez's promise to pay the

Signing Fee was exchanged for Tarpon Bay's return promise to initiate the section 3(a)(10) proceeding.

But genuine issues of material fact remain as to whether there was valid offer and acceptance under this theory. An offer is a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *U.S. Bank Nat'l Ass'n v. Eichten*, 184 Conn. App. 727, 773 (2018) (quoting Restatement (Second) of Conts. § 24); *see also* Restatement (Second) of Conts. § 2 cmt. b ("A promisor manifests an intention if he believes *or has reason to believe* that the promisee will infer that intention from his words or conduct." (emphasis added)). A factfinder may well conclude that, independent of Zerez's subjective intent, Tarpon Bay was justified in understanding the Signing Fee Note to be an invitation to initiate the transaction. Its execution, after all, shortly followed Aswani's statement to Murga that the Signing Fee Note was meant to

compensate Tarpon Bay for transaction services and was a prerequisite to entering into a definitive agreement, and Murga did not say anything to the contrary. *See* Joint App'x at 1152. But as mentioned above, Hicks stated in deposition testimony that he believed Tarpon Bay was entitled to the Signing Fee Note "regardless of whether or not Tarpon Bay ultimately performed work." *Id.* at 1203. That evidence supports the contrary conclusion that Tarpon Bay did not understand the Signing Fee Note as an offer that, once accepted, would compel performance. There is ultimately little evidence of "[t]he parties' intentions manifested by their acts and words," which "are essential to the court's determination of whether a contract was entered into and what its terms were." *Auto Glass Exp., Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 225 (2009) (internal quotation marks and citation omitted). Because the questions of offer and acceptance are at the heart of this case and will benefit from a full

record at trial, the second option is foreclosed at summary judgment.

Finally, the third option is precluded because the record does not clearly establish that the Term Sheet was a binding agreement. Indeed, the Term Sheet contains a caveat:

> The terms set forth above do not constitute a contractual commitment of the Company or the Purchaser, but merely represent proposed terms for possible liabilities satisfaction. Until *definitive documentation* is executed by all parties, there shall not exist any binding obligation . . . .

*Id.* at 984 (emphasis added). The parties dispute the meaning and importance of "definitive documentation." Zerez argues that because there was no "definitive documentation," the Term Sheet does not represent a "binding obligation." *See* Cross-Appellant's Br. at 34. Hicks testified that this paragraph was "leftover from a different . . . strategy" and unintentionally integrated into this transaction. Joint App'x at 1206. Yet he also testified that the "definitive agreement is the complaint" filed in state court, and that "the claims purchase agreements are really the first thing as far as

62

documentation is concerned." *Id.* at 1204. Because the meaning and satisfaction of the "definitive documentation" requirement raise genuine issues of material fact as to whether the Term Sheet was binding, option three does not support summary judgment for Tarpon Bay.[23]

The record in this case presents several genuine issues of material fact as to whether there was consideration supporting the Signing Fee Note. Because these factual issues "may reasonably be resolved in favor of either party," *Anderson*, 477 U.S. at 250, the district court correctly held that Zerez established a genuine dispute of material fact as to whether the Signing Fee Note was supported by consideration. We affirm the district court's denial of summary judgment and remand the issue of contract formation for further

---

[23] Tarpon Bay does not appear to argue that the Signing Fee Note was itself the "definitive documentation" that would render the Term Sheet binding. Hick's deposition testimony, as well as Aswani's statement to Murga that the Signing Fee Note was a prerequisite to entering into a definitive agreement, both suggest that "definitive documentation" referred to a document after the Signing Fee Note. *Id.* at 1152.

proceedings.

### C.   CUTPA

Zerez also argues that the district court erred in granting summary judgment on Counterclaim Eleven, which alleged that Counterclaim Defendants violated CUTPA. *See* Conn. Gen. Stat. §§ 42-110a to -110q. A party seeking to "prevail on a CUTPA claim . . . must prove that (1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; and (2) each class member claiming entitlement to relief under CUTPA has suffered an ascertainable loss of money or property as a result of the defendant's acts or practices." *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 217 (2008) (internal quotation marks and citations omitted); *see also* Conn. Gen. Stat. § 42-110b(a), -110g(a).[24] The district court concluded that "Zerez simply assert[ed]

---

[24] Under the CUTPA provisions relevant here, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). "Any person who suffers any ascertainable loss of money or property, real or personal, as a

64

a breach of contract claim in the guise of a CUTPA claim" and did not demonstrate an "ascertainable loss" cognizable under the statute. *Tarpon Bay II*, 547 F. Supp. 3d at 223. Because Zerez failed to establish a CUTPA claim, the district court determined that it "need not decide whether . . . CUTPA applies to the Signing Fee Note." *Id.* Summary judgment entered for Counterclaim Defendants on that count accordingly. Judgment at 2.

We affirm the district court's grant of summary judgment on the alternative grounds that CUTPA does not apply to the case at bar.[25] "CUTPA does not apply to deceptive practices in the purchase

---

result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages." Conn. Gen. Stat. § 42-110g(a).

[25] While the parties raised the issue of CUTPA's applicability before the district court, *see* Joint App'x at 1867–68, they did not do so in their briefing before this court. An argument not raised on appeal is generally deemed abandoned. *See United States v. Joyner*, 313 F.3d 40, 44 (2d Cir. 2002). But rules concerning waiver are "prudential, not jurisdictional," and we have exercised our discretion to review waived or abandoned arguments "where . . . the argument presents a question of law and there is no need for additional fact-finding." *Sniado v. Bank Aus. AG*, 378 F.3d 210, 213 (2d Cir. 2004); *see also United States v. Babwah*, 972 F.2d 30, 35 (2d Cir. 1992) (noting that a court of appeals has discretion to consider argument not raised on appeal "if manifest injustice otherwise would result").

and sale of securities." *Russell v. Dean Witter Reynolds, Inc.*, 200 Conn. 172, 180 (1986). Despite the broad sweep of CUTPA's text encompassing "deceptive acts . . . in the conduct of *any* trade or commerce," Conn. Gen. Stat. § 42-110b(a) (emphasis added), "Federal Trade Commission (FTC) rulings and cases under the Federal Trade Commission Act . . . serve as a lodestar for interpret[ing]" CUTPA, *Russell*, 200 Conn. at 179. Because "[t]he FTC has never undertaken to adjudicate deceptive conduct in . . . transactions fall[ing] under the comprehensive regulatory umbrella of the Securities and Exchange Commission," transactions governed by the federal securities laws likewise fall outside CUTPA's ambit. *Id.* at 180. That said, the securities carveout is not so broad that the mere involvement of stock in an allegedly deceptive act is sufficient to preclude CUTPA's application. *See, e.g.*, *Halo Tech Holdings, Inc. v. Cooper*, No. 3:07CV00489(AHN), 2008 WL 877156, at *19 (D. Conn. Mar. 26, 2008) ("[U]se of a stock sale simply as the means for effecting the transfer of

a corporation should not remove it from the purview of CUTPA, when CUTPA would clearly apply if a sale of assets occurred instead." (internal quotation marks omitted) (quoting *TIE/Commc'ns, Inc. v. Kopp*, No. 64983, 1993 WL 515680, at *8 (Conn. Super. Ct. Nov. 29, 1993)).

CUTPA does not apply to the alleged deception in this case. Zerez alleges that "Counterclaim Defendants' . . . acts violate the Connecticut Unfair Trade Practices Act . . . , in that their conduct was unfair, immoral, oppressive, unethical, unscrupulous and/or deceptive and has caused substantial injury to Zerez." Joint App'x at 890. But any deceptive conduct would have been in furtherance of the parties' transaction, which intended a sale of debt for equity pursuant to section 3(a)(10) of the Securities Act. Because the antifraud provisions of the federal securities laws would regulate allegedly deceptive conduct in section 3(a)(10) transactions, the dispute at bar falls outside of CUTPA's scope. *See Russell*, 200 Conn.

at 179–80.

Upon supervision and approval by a judicial or administrative body, section 3(a)(10) of the Securities Act of 1933 may exempt an issuer from registering securities issued in exchange for outstanding securities or other qualifying value. *See* 15 U.S.C. § 77c(a)(10). The provision specifically exempts from registration:

> [A]ny security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval . . . .

*Id.* Section 3(a)(10) transactions arise most frequently in three contexts: litigation settlement involving an exchange of shares, bankruptcy proceedings not subject to Chapter 11 of the Bankruptcy Code, or, as here, the reorganization or capital restructuring of solvent

businesses.  *See* 7 J. William Hicks, *Exempted Transactions Under the Securities Act of 1933* § 3:1 (2023).

Despite their exemption from registration, *see* 15 U.S.C. § 77c(a), section 3(a)(10) transactions are still subject to the antifraud provisions of the Securities Act, *see id.* § 77q(c).  Section 17(a) makes it illegal for "any person in the offer or sale of any securities . . . to employ any device, scheme, or artifice to defraud," or "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a)(1), (3).  Although there is a paucity of case law on point, it appears undisputed that allegedly fraudulent or deceptive conduct in the course of executing section 3(a)(10) transactions may indeed violate section 17(a) upon meeting all the requisite elements.  *See, e.g., In re Am. Trailer Rentals Co.*, 325 F.2d 47, 52 & n.11 (10th Cir. 1963), *rev'd on different grounds sub nom. SEC v. Am. Trailer Rentals Co.*, 379 U.S. 594 (1965); *SEC v. Johnson*, No. 2:20CV08985(FWS), 2023 WL

2628680, at \*6–8 (C.D. Cal. Mar. 2, 2023); *SEC v. Currency Trading Int'l*, No. 02CV05143(PA), 2004 WL 2753128, at \*6, 10 (C.D. Cal. Feb. 2, 2004); *SEC v. Granco Prods.*, 236 F. Supp. 968, 970 (S.D.N.Y. 1964); *see also Staff Legal Bulletin No. 3A (CF)*, U.S. SEC (June 18, 2008), https://www.sec.gov/corpfin/staff-legal-bulletin-3a (stating the SEC's view that "the anti-fraud requirements of the federal securities laws would govern disclosure" to parties to whom securities would be issued after a section 3(a)(10) transaction).

Any attempt to separate the Signing Fee Note from the underlying scheme to effectuate a section 3(a)(10) transaction is ultimately unconvincing. While one may confine the allegedly deceptive conduct to the Signing Fee Note rather than the transaction writ large, all parties agreed that the Signing Fee Note was executed pursuant to the Signing Fee provision in the Term Sheet. *See* Joint App'x at 1445 ("[I]n satisfaction of its obligation to pay Tarpon the Signing Fee, Zerez executed . . . the Signing Fee Note."); *id.* at 1298

70

("Admitted and Zerez respectfully refers the Court to the referenced document for its complete terms."). The Term Sheet, in turn, makes clear that the parties contemplated a debt-for-equity transaction under section 3(a)(10) that would be exempt from registration. *See id.* at 981. Moreover, even if the motives behind the Signing Fee Note were limited to the Term Sheet's stated purpose of covering Tarpon Bay's "legal fees due upon the execution of the term sheet," *id.* at 983, the Signing Fee Note's option to convert the Signing Fee into Zerez stock renders it part of the larger securities transaction. *See* 15 U.S.C. § 77b(a)(3) ("Any security given or delivered with, or as a bonus on account of, any purchase of securities or any other thing, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been offered and sold for value.").

CUTPA may not exceed its broad yet well-defined limits where the transactions "for the purchase and sale of securities" are such that the federal securities laws would apply. *Russell*, 200 Conn. at 180.

Because section 17(a) of the Securities Act would apply to allegedly deceptive behavior in a section 3(a)(10) transaction, CUTPA does not apply to Counterclaim Defendants' alleged actions. The district court's grant of summary judgment for Counterclaim Defendants on Counterclaim Eleven is accordingly affirmed.

## IV.    Conclusion

For the foregoing reasons, we **VACATE** the district court's holding that the Signing Fee Note was unconscionable and therefore unenforceable as a matter of law, **AFFIRM** the district court's denial of summary judgment because genuine issues of material fact remain as to whether consideration supported the Signing Fee Note, and **AFFIRM** the Judgment as to the CUTPA counterclaim. Without intimating a view on Zerez's counterclaims not raised on appeal, we accordingly **REMAND** to the district court for further proceedings consistent with this opinion.